**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IMRAN AHMED, <br><br> *Plaintiff*, <br><br> v. <br><br> MARCO RUBIO, in his official capacity as Secretary of State; SARAH B. ROGERS, in her official capacity as Under Secretary of State for Public Diplomacy; PAMELA BONDI, in her official capacity as Attorney General; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; JUDITH ALMODOVAR, in her official capacity as Acting Field Office Director of the New York Immigration and Customs Enforcement Office, <br><br> *Defendants*. | Case No. 25 Civ. 10705 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF**
**IMRAN AHMED'S PROPOSED ORDER TO SHOW CAUSE FOR A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    A.    Mr. Ahmed and His Commitment to Preventing Hate and Discrimination............ 3

    B.    Mr. Ahmed's and CCDH's Reporting on Social Media Platforms ........................ 4

    C.    Defendants Target Mr. Ahmed for Removal Based on His Protected Speech ....... 6

    D.    The Current Administration's Practice of Using the Foreign Policy Ground to
        Suppress Disfavored Speech ................................................................................... 8

LEGAL STANDARD .............................................................................................................. 9

ARGUMENT .......................................................................................................................... 9

  I.   MR. AHMED IS LIKELY TO SUCCEED ON THE MERITS ...................................... 10

    A.    Defendants' Actions Violate the First Amendment .............................................. 10

        1.    Defendants' Actions Constitute Unlawful First Amendment
            Retaliation ................................................................................................ 10

        2.    Defendants' Actions Constitute Unlawful Viewpoint Discrimination ..... 13

    B.    Mr. Ahmed's Detention Would Violate Due Process ........................................... 15

    C.    Defendants' Actions Are Arbitrary and Capricious in Violation of the APA ...... 15

  II.  MR. AHMED WOULD SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE
       RELIEF ........................................................................................................................ 17

  III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR
       INJUNCTIVE RELIEF ................................................................................................ 20

CONCLUSION ...................................................................................................................... 22

# TABLE OF AUTHORITIES

**CASES** *Page(s)*

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986) ................................................................... 14

*Aditya W.H. v. Trump*,
2025 WL 1420131 (D. Minn. May 14, 2025) ............................................... 15

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ..................................................................................... 13

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
651 F.3d 218 (2d Cir. 2011) ......................................................................... 13

*Am. Ass'n of Univ. Professors v. Rubio*,
2025 WL 2777659 (D. Mass. Sept. 30, 2025) ...................................... 12, 14, 16, 17

*American Association of University Professors v. Rubio*,
780 F. Supp. 3d 350 (D. Mass. 2025) .......................................................... 18

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ....................................................................................... 10

*Black v. Decker*,
103 F.4th 133 (2d Cir. 2024) ....................................................................... 15

*Bridges v. California*,
314 U.S. 252 (1941) ..................................................................................... 10

*Bridges v. Wixon*,
326 U.S. 135 (1945) ............................................................................ 10, 11, 14

*Connick v. Myers*,
461 U.S. 138 (1983) ..................................................................................... 11

*Coronel v. Decker*,
449 F. Supp. 3d 274 (S.D.N.Y. 2020) .......................................................... 20

*Coscarelli v. ESquared Hosp. LLC*,
364 F. Supp. 3d 207 (S.D.N.Y. 2019) .......................................................... 17

*Dorsett v. County of Nassau*,
732 F.3d 157 (2d Cir. 2013) ......................................................................... 11

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985) ............................................................................. 11

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................................. 18

*Ercelik v. Hyde*,
    2025 WL 1361543 (D. Mass. May 8, 2025) ......................................... 15

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ................................................................. 17

*Hardy v. Fischer*,
    701 F. Supp. 2d 614 (S.D.N.Y. 2010) .................................................. 18

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ................................................................................. 14

*Jayaraj v. Scappini*,
    66 F.3d 36 (2d Cir. 1995) ..................................................................... 19

*Joint Anti-Fascist Comm. v. McGrath*,
    341 U.S. 123 (1951) ............................................................................. 15

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996) ................................................................... 18

*Jones v. United States*,
    463 U.S. 354 (1983) ............................................................................. 18

*Khalil v. Trump*,
    786 F. Supp. 3d 871 (D.N.J. 2025) ...................................................... 19

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ............................................................................. 14

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................. 20

*Lerman v. Bd. of Elections in City of New York*,
    232 F.3d 135 (2d Cir. 2000) ................................................................. 11

*Mahdawi v. Trump*,
    2025 WL 1243135 (D. Vt. Apr. 30, 2025) ........................................... 10

*Mahdawi v. Trump*,
    136 F.4th 443 (2d Cir. 2025) ............................................................... 10, 15

*Make the Rd. N.Y. v. Pompeo*,
    475 F. Supp. 3d 232 (S.D.N.Y. 2020) ........................................................ 20

*Martin v. City of Struthers*,
    319 U.S. 141 (1943) ............................................................................ 14

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................ 15

*Meyer v. Grant*,
    486 U.S. 414 (1988) ........................................................................ 11, 13

*Mohammed H. v. Trump*,
    2025 WL 1692739 (D. Minn. June 17, 2025) .............................................. 15

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
    429 U.S. 274 (1977) ............................................................................ 12

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ............................................................................ 10

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) ............................................................................ 14

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) .............................................................. 18, 21

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................ 13

*New York v. D.H.S.*,
    408 F. Supp. 3d 334 (S.D.N.Y. 2019) ........................................................ 20

*New York v. D.H.S.*,
    969 F.3d 42 (2d Cir. 2020) .................................................................... 20

*New York v. U.S. Dep't of Educ.*,
    477 F. Supp. 3d 279 (S.D.N.Y. 2020) ......................................................... 9

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020) .................................................................... 20

*Nieves v. Bartlett,*
　587 U.S. 391 (2019) ................................................................... 11

*Nken v. Holder,*
　556 U.S. 418 (2009) ................................................................ 9, 20

*Ozturk v. Hyde,*
　136 F.4th 382 (2d Cir. 2025) .................................................. 10, 12

*Öztürk v. Trump,*
　2025 WL 1145250 (D. Vt. Apr. 18, 2025) ..................................... 15

*R.A.V. v. City of St. Paul,*
　505 U.S. 377 (1992) ................................................................... 14

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
　525 U.S. 471 (1999) ................................................................... 10

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
　515 U.S. 819 (1995) ................................................................... 13

*Saget v. Trump,*
　375 F. Supp. 3d 280 (E.D.N.Y. 2019) ......................................... 20

*Sajous v. Decker,*
　2018 WL 2357266 (S.D.N.Y. May 23, 2013) ................................ 20

*Smith v. Campbell,*
　782 F.3d 93 (2d Cir. 2015) ......................................................... 11

*Snyder v. Phelps,*
　562 U.S. 443 (2011) ................................................................... 11

*Taal v. Trump,*
　2025 WL 926207 (N.D.N.Y. Mar. 27, 2025) ................................ 19

*Turner Broadcasting System, Inc. v. FCC,*
　512 U.S. 622 (1994) ................................................................... 13

*Velasco Lopez v. Decker,*
　978 F.3d 842 (2d Cir. 2020) ....................................................... 18

*Velesaca Lopez v. Decker,*
　458 F. Supp. 3d 224 (S.D.N.Y. 2020) ......................................... 18

*Yang v. Kosinski,*
  960 F.3d 119 (2d Cir. 2020)..........................................................................................19

*Zadvydas v. Davis,*
  533 U.S. 678 (2001)......................................................................................................15

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. I ......................................................................................................21

**STATUTES**

5 U.S.C. § 706(2)(A)-(D)..................................................................................................16

8 U.S.C. § 1227(a)(4)(C) ..................................................................................................16

European Union's Digital Services Act ....................................................................*passim*

Immigration and Nationality Act 212(a)(3)(C)..................................................................7

Immigration and Nationality Act 237(a)(4)(C)..................................................................7

Lanham Act...........................................................................................................................6

United Kingdom's Online Safety Act ....................................................................1, 5, 8, 11

**OTHER AUTHORITIES**

CCDH, *State Hate: How Iran's Press TV Uses Social Media to Promote Anti-Jewish Hatred,*
  April 27, 2023, https://counterhate.com/blog/new-report-state-hate/ .........................5

CCDH, *The Disinformation Dozen: Why Platforms Must Act on Twelve Leading Online Anti-Vaxxers,* March 24, 2021, https://counterhate.com/research/the-disinformation-dozen/ ....... 4, 6

Elizabeth Troutman Mitchell, *Exclusive: Trump Bars Global Censorship Agents From Entering US*, Daily Signal (Dec. 23, 2025), https://www.dailysignal.com/2025/12/23/exclusive-trump-bars-five-europeans-accused-on-censoring-american-speech-from-entering-us/......................7

## PRELIMINARY STATEMENT

Yesterday afternoon—about an hour before the Court closed for the holidays—Under Secretary of State Sarah B. Rogers posted on X that the Department of State had "SANCTIONED" Plaintiff Imran Ahmed, an advocate for human rights and civil liberties online, and a British citizen and legal permanent resident of the United States who has lived and worked here with his American wife and American daughter for five years.[1]  Under Secretary Rogers explicitly tied these sanctions to the speech and advocacy of Mr. Ahmed's non-profit organization, the Center for Countering Digital Hate ("CCDH"), which identifies social media dangers such as instructions from AI chatbots on the best ways for children to commit suicide and carry out acts of violence in their schools.

CCDH's research is likely unpopular among large tech companies, but its purpose is to raise awareness among the public and protect American children and internet users.  Under Secretary Rogers suggests, however, that Mr. Ahmed and CCDH's research could somehow have "potentially serious adverse foreign policy consequences for the United States" and announced a shocking plan to deport Mr. Ahmed from this country because of his speech.  To support this outrageous decision she cited the fact that CCDH has: (1) filed publicly available reports on the proliferation of anti-vaccine misinformation on social media; and (2) conducted and published research supporting the United Kingdom's Online Safety Act and the European Union's Digital Services Act, which promote greater transparency and accountability for social media platforms, two actions that are explicitly protected by the First Amendment.  According to a separate press release issued by Defendant Secretary of State Marco Rubio the same day, as a result of these

---

[1] Declaration of D. Brandon Trice ("Trice Decl."), Ex. A, X.com, Under Secretary of State Sarah B. Rogers, @UnderSecPD (Dec. 23, 2025) (3:46 p.m.), https://x.com/UnderSecPD/status/2003567950541058394.

sanctions, Mr. Ahmed is now being subjected to "visa restrictions" and "removal proceedings" and he will be "generally barred from entering the United States."[2]  In other words, on Christmas Eve, Mr. Ahmed has now abruptly had his legal permanent resident status thrown into question and faces the imminent prospect of unconstitutional arrest, detention, expulsion from his home country, and separation from his American wife and young daughter, for exercising his basic First Amendment rights.

This is not the way our system of laws works.  The Constitution prevents the government from punishing Mr. Ahmed for his speech and advocacy.  Mr. Ahmed's effort to protect children from social media dangers and harmful hate speech does not present "serious foreign policy consequences"—any more than do the actions of the United Kingdom and European Union legislators who voted to pass the laws that Secretary Rubio apparently does not like.  Indeed, the real motivator for Defendants' actions against Mr. Ahmed appears to be that he has criticized X, and Elon Musk in particular, for failing to properly monitor and regulate hate speech and dangerous, violent content on that platform—including not only misinformation by anti-vaxxers, but the growing scourge of antisemitic content.  That too is obviously not a basis for the United States government to "pick sides" in a public debate and to try to remove Mr. Ahmed from the country.

The government also cannot evade judicial review by sanctioning Mr. Ahmed in the midst of the holiday season, and then spiriting him away from New York (where he is currently present) to whatever detention center it wants before this Court can review its actions in the first instance.

---

[2] Trice Decl., Ex. B ("Rubio Declaration"), U.S. Dep't of State, "Announcement of Actions to Combat the Global Censorship-Industrial Complex" (Dec. 23, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/12/announcement-of-actions-to-combat-the-global-censorship-industrial-complex/.

Mr. Ahmed is entitled to due process, and that includes an orderly determination by this Court as to whether Defendants can, consistent with the Constitution, the Immigration and Nationality Act ("INA"), and their own regulations, summarily arrest and detain him.  A temporary restraining order to enjoin Defendants from unlawfully detaining Mr. Ahmed and transferring him is urgently necessary because the Department of Homeland Security ("DHS") has unlawfully detained and transferred other individuals on the basis of the same provisions of the INA, which the State Department has now cited to seek to detain and deport Mr. Ahmed.

## BACKGROUND

### A.    Mr. Ahmed and His Commitment to Preventing Hate and Discrimination

Mr. Ahmed is a forty-seven-year-old citizen of the United Kingdom and a lawful permanent resident of the United States.  Compl. ¶ 15-16.  He was born in Manchester, England, in 1978, and attended Manchester Grammar School.  *Id.* ¶ 16.  His family is Pashtun, one of the largest ethnic groups in Afghanistan.  *Id.*

Mr. Ahmed turned twenty-three on September 12, 2001, a day after the Taliban took down the World Trade Center towers in New York City.  *Id.* ¶ 17.  The Taliban were Pashtun, and Mr. Ahmed felt a strong sense of purpose to devote his life to addressing evil in the world.  *Id.*  He returned to formal study and earned a degree in politics from the University of Cambridge before embarking on a long career in public service and political strategy within the United Kingdom's Labour Party.  *Id.*

By 2016, while working in British politics, Mr. Ahmed observed a sharp rise in antisemitism, xenophobia, and extremist organizing in the United Kingdom, particularly during the campaign surrounding the Brexit referendum.  *Id.* ¶ 18.  He witnessed Britain First, a political party in the United Kingdom, promote conspiracy theories falsely claiming that the European Union sought to "destroy" white British citizens through immigration.  *Id.*  Things came to a head

in November 2016, when Mr. Ahmed's Labour Party colleague, Member of Parliament Jo Cox, was murdered in a politically motivated attack. *Id.* ¶ 19. The assailant shouted "Britain First" and "keep Britain independent" during the killing and had reportedly accessed extremist and white-supremacist materials on the days leading up to the attack. *Id.* The murder profoundly affected Mr. Ahmed and reinforced his resolve to confront the role of digital platforms in amplifying extremist ideology and violence. *Id.* ¶ 20.

On January 8, 2021, Mr. Ahmed received permission to move to the United States on an O-1 visa, a nonimmigrant classification reserved for individuals who possess extraordinary ability in their field. *Id.* ¶ 15. He later married his wife, an American citizen, and in 2024 he obtained lawful permanent resident status. *Id.* Mr. Ahmed now lives with his wife and his daughter in Washington, D.C., *id.*, though he is currently in New York City, *id.* ¶ 6.

**B.     Mr. Ahmed's and CCDH's Reporting on Social Media Platforms**

Mr. Ahmed formed CCDH in 2019 to call attention to the enormous problem of digitally driven disinformation and hate online. *Id.* ¶ 20. CCDH's mission is to protect human rights and civil liberties online by identifying systemic failures in platform governance and the role of algorithms in amplifying harmful content. *Id.* ¶ 21-23.

CCDH first gained widespread attention for its research in 2021, when it published *The Disinformation Dozen*. *Id.* ¶ 23(d). That report found that just twelve individuals were responsible for nearly two-thirds of anti-vaccine content circulating on major social media platforms. *Id.* The research further showed that, despite repeated violations of the platforms' terms of service, most of those individuals remained active on Facebook, Instagram, and Twitter. *Id.* During the same period, CCDH documented that the platforms failed to act on the overwhelming majority of reported COVID-19 and vaccine misinformation and, in some cases, actively recommended similar content through their algorithms. *Id.*

In subsequent years, CCDH expanded its reporting to examine the use of social media by state and non-state actors to promote hate.  In April 2023, CCDH co-authored a report with the Anti-Defamation League entitled *How Iran's Press TV Uses Social Media to Promote Anti-Jewish Hatred*, which detailed how a foreign state actor used state-controlled media accounts to disseminate antisemitism, Holocaust denial, and hateful views about LGBTQ+ people and women's rights to millions of users worldwide.  *Id.* ¶ 32(d).  CCDH has also worked to draw attention to harmful content that social media and online search companies often end up pushing to children.  For example, a December 2022 report examined how TikTok's algorithm recommends suicide, self-harm, and eating disorder content to teen users within minutes of their signing up for an account.  *Id.* ¶ 23(e).  And a recent report from CCDH discusses how ChatGPT responds to teen users by providing dangerous advice about self-harm, suicide, eating disorders, and drugs.  *Id.* ¶ 23(g).

CCDH also examined how changes in platform ownership and governance affected the prevalence of hate speech.  Research conducted by CCDH and reported on the front page of *The New York Times* showed a marked increase in hate speech on X following Elon Musk's acquisition of the platform, including a tripling in the use of the N-word during the week after the change in ownership compared to the prior year's daily average.  *Id.* ¶ 30.

 In recent years, CCDH has supported the enactment of online-safety and digital-services legislation in response to concerns about the role of social media platforms in amplifying hate, disinformation, and extremist content.  *Id.* ¶ 24-27.  CCDH has commented on the enactment of the United Kingdom's Online Safety Act and the European Union's Digital Services Act, which require large technology platforms to assess and mitigate systemic risks, and reduce the spread of unlawful and harmful material online.  *Id.* ¶ 24-25.  And it has advocated for reforming Section

230 of the Communications Decency Act in the United States, calling for a more nuanced approach to liability protections for social media companies for the content that appears on their platforms. *Id.* ¶ 27.

As CCDH's reporting gained visibility, it drew criticism from the platforms it criticized. In July 2023, X Corp. ("X") sent a letter to Mr. Ahmed and CCDH criticizing their work and threatening litigation under the Lanham Act. *Id.* ¶ 28. Days later, X filed suit in the Northern District of California, asserting claims based on three CCDH reports, including *The Disinformation Dozen*, and alleging that CCDH had gathered and published its research without authorization. *Id.* ¶¶ 29-31. On March 25, 2024, the district court dismissed the action in its entirety, finding that California's anti-SLAPP law (which is meant to protect free speech rights) applied to X's claims and concluding that the lawsuit was "unabashedly and vociferously" about "punishing the Defendants for their speech." *Id.* ¶ 32. X has appealed that decision, and that appeal is currently pending before the United States Court of Appeals for the Ninth Circuit. *Id.*

### C.    Defendants Target Mr. Ahmed for Removal Based on His Protected Speech

Earlier this month, on December 4, 2025, the European Commission issued a fine of 120 million euros against X for violations of the Digital Services Act's provisions governing transparency, accessibility, and deceptive practices. *Id.* ¶ 33. The ruling drew a strong reaction from the Trump Administration, with the President describing it as "nasty" and criticizing the European Union for going in "bad directions." *Id.* ¶ 34. Secretary Rubio posted to social media that the ruling was "an attack on all American tech platforms and the American people by foreign governments" and declared that "[t]he days of censoring Americans online are over." *Id.* ¶ 35.

On December 23, Secretary Rubio issued a press release announcing that the State Department "is taking decisive action against five individuals" for their protected speech activities. *Id.* ¶ 36. The press release further announced that Secretary Rubio had made a determination that

the individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States" and noted that  the Department of Homeland Security "can initiate removal proceedings against certain individuals pursuant to INA section 237(a)(4)(C), which renders such individuals deportable." *Id.*  The press release explained that "[t]hese actions are pursuant to Section 212(a)(3)(C) of the Immigration and Nationality Act" (the "Foreign Policy Ground"). *Id.*  The announcement by Secretary Rubio was widely perceived as being linked to the European Commission's fine against X earlier this month.[3]

That same day, December 23, Under Secretary of State Sarah B. Rogers posted (ironically, on X): "Today, the United States issued SANCTIONS reinforcing the 'red line' I invoked on @GBNEWS. Namely: extraterritorial censorship of Americans.  Today's sanctions target the censorship-NGO ecosystem." *Id.* ¶ 37.[4]  She continued: "WE'VE SANCTIONED: Imran Ahmed, key collaborator with the Biden Administration's effort to weaponize the government against U.S. citizens.  Ahmed's group, Center for Countering Digital Hate (CCDH), created the infamous 'disinformation dozen' report, which called for platforms to deplatform twelve American 'anti-vaxxers', including now-HHS Secretary @SecKennedy." *Id.*  Under Secretary Rogers also

---

[3] *See, e.g.*, Adam Satariano, *They Seek to Curb Online Hate. The U.S. Accuses Them of Censorship.*, N.Y. Times (Dec. 24, 2025), https://www.nytimes.com/2025/12/24/business/europe-us-online-censorship-free-speech.html.

[4] Also on December 23, 2025, an article was published by Elizabeth Troutman Mitchell at *The Daily Signal*.  The article, which describes a State Department document obtained by *The Daily Signal*, notes that Mr. Ahmed is "subject to deportation."  Elizabeth Troutman Mitchell, *Exclusive: Trump Bars Global Censorship Agents From Entering US*, Daily Signal (Dec. 23, 2025), https://www.dailysignal.com/2025/12/23/exclusive-trump-bars-five-europeans-accused-on-censoring-american-speech-from-entering-us/.  The article further explains: "Due to Secretary of State Marco Rubio's foreign policy determination, the Department of Homeland Security can now initiate removal proceedings." *Id.*

pointed to CCDH's support for the Online Safety Act and the Digital Services Act.  *Id.*[5]



*Figure 1 – December 23, 2025 Social Media Post by Under Secretary of State Sarah B. Rogers*

### D.    The Current Administration's Practice of Using the Foreign Policy Ground to Suppress Disfavored Speech

The Administration's targeting of Mr. Ahmed did not occur in isolation.  Over the past year, the Administration has repeatedly employed the same retaliatory playbook against noncitizens whose speech it disfavors.  *Id.* ¶ 42, 50-53 (collecting examples).  First, the Administration identifies an individual based on protected advocacy of certain views it dislikes. *Id.* ¶ 50.  Then, ICE arrests the individual suddenly in a public or domestic setting.  *Id.*  The individual is denied any meaningful process.  *Id.*  They are then transferred hundreds or thousands of miles away—often overnight—to remote detention facilities far from their families, communities, and counsel.  *Id.*

Across these cases, the government's objective is both clear and distinctive.  The arrests do not follow criminal investigations or adjudicated violations of law.  They follow speech.  And

---

[5] Earlier today, Elon Musk posted on X, "This is so great," with an emoji of a smiling face with star eyes, in response to another user commenting on the Administration's action to impose immigration sanctions on Mr. Ahmed and others.  *Id.* ¶ 41.

the transfers are not incidental; they are central to the strategy. *Id.* ¶ 54.  By moving detainees across vast distances immediately after arrest—often after counsel has appeared or litigation has begun—the government isolates its targets, disrupts judicial review, and amplifies the punitive effect of detention. *Id.*  In other words, the distance itself becomes the punishment.[6]

Mr. Ahmed now faces that same threat.  Although Mr. Ahmed has yet not received a Notice to Appear or been detained, the government's actions fit squarely within this established pattern of retaliatory enforcement—one that uses immigration power not to advance legitimate regulatory goals, but to punish dissent and deter protected speech. *Id.* ¶ 55.

## LEGAL STANDARD

A plaintiff seeking a temporary restraining order must show, as Plaintiff has shown here, that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020).  If the federal government is the opposing party, then the last two factors merge. *Id.* at 294 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

## ARGUMENT

Mr. Ahmed is a father to one young child who is a U.S. citizen, husband to a wife who is a U.S. citizen, and a legal permanent resident of the United States who has lived and worked here since arriving on an O-1 visa granted by the first Trump Administration in 2021.  But because of Defendants' arbitrary decision, taken two days before Christmas, to punish individuals who identify and speak out against the growing threat of antisemitism and hate in online platforms, he

---

[6] We also note that the undersigned counsel from Kaplan Martin LLP have represented Mr. Ahmed and CCDH for years and are based in New York City.

now faces the imminent prospect of unconstitutional detention for exercising his First Amendment rights.  A temporary restraining order preventing such unlawful detention is warranted in light of Mr. Ahmed's likelihood of success on the merits of showing that Defendants' actions are unconstitutional and arbitrary and capricious, the irreparable harm that Mr. Ahmed will experience absent injunctive relief, and the balance of hardships, which overwhelmingly favor Mr. Ahmed.[7]

## I.      MR. AHMED IS LIKELY TO SUCCEED ON THE MERITS

As set forth below, Mr. Ahmed is likely to succeed on the merits of his claims that Defendants' purported actions to "sanction" him violate his First Amendment and Due Process rights and violate the Administrative Procedure Act.  The fact that this case arises in the context of government action purportedly taken pursuant to the INA does not undermine Mr. Ahmed's claims or deprive this Court of jurisdiction.  *See Mahdawi v. Trump*, 136 F.4th 443, 449-52 (2d Cir. 2025); *Ozturk v. Hyde*, 136 F.4th 382, 394-99 (2d Cir. 2025).

### A.      Defendants' Actions Violate the First Amendment

#### 1.      *Defendants' Actions Constitute Unlawful First Amendment Retaliation*

As the Supreme Court unanimously reiterated just last year, "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion ... to achieve the suppression' of disfavored speech."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).  This applies equally to non-citizens; the First Amendment has long protected the rights of non-citizens to publish reports criticizing institutions and to support particular political causes. *See Bridges v. California*, 314 U.S. 252 (1941) ("*Bridges I*"); *Bridges v. Wixon*, 326 U.S. 135

---

[7] In the event that Defendants detain Mr. Ahmed before this Court has an opportunity to rule on this motion for a temporary restraining order, Mr. Ahmed reserves his right to seek habeas relief and plans to do so.

(1945) ("*Bridges II*").  Indeed, it "is well settled that '[f]reedom of speech and of press is accorded aliens residing in this country.'"  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring) (quoting *Bridges II*, 326 U.S. at 148).

"As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech."  *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up).  To succeed on a First Amendment retaliation claim, a plaintiff must show that "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the defendant's actions caused him some injury."  *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (quoting *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)).  Mr. Ahmed is likely to succeed in establishing each of these elements here.

First, Mr. Ahmed's expressive activity in reporting on and discussing the prevalence of antisemitic and other hate speech on social media platforms is speech on matters of "public concern" which are "at the heart of the First Amendment's protection."  *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-759 (1985)).  In fact, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  *Id.* at 452 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).  Moreover, Under Secretary Rogers has specifically pointed to CCDH's support for the Online Safety Act and Digital Services Act as one of the reasons for sanctioning him.  Ex. A.  But expressing support for or opposition to particular laws or political outcomes is "core political speech," *Meyer v. Grant*, 486 U.S. 414, 422 (1988), for which "the importance of First Amendment protections is 'at its zenith.'"  *Id.* at 425.  Government consequences based on Mr. Ahmed's core political speech are subject to "exacting scrutiny," *Lerman v. Bd. of Elections*

*in City of New York*, 232 F.3d 135, 146 (2d Cir. 2000), which Defendants cannot possibly meet here.

Second, Mr. Ahmed need only prove that his expressive activity was a "motivating factor" in Defendants' decision to sanction him, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), and Defendants have openly admitted that their actions were motivated by Mr. Ahmed's exercise of his First Amendment rights. For example, as mentioned above, Defendant Rogers explicitly called out CCDH's support for UK and EU laws designed to protect consumers as part of the justification for Defendants' sanctions against him. Ex. A. This implicates Mr. Ahmed's core political speech. Under Secretary Rogers also pointed to CCDH's publication of a report on anti-vaccine influencers, which also implicates Mr. Ahmed's speech rights (and has no obvious connection to the supposed "foreign policy consequences" mentioned in the Rubio Declaration). *Id.* And sadly this comes as no surprise given that federal officials in recent months have repeatedly expressed or acted on the desire to revoke the legal status of and/or remove individuals with whose speech they disagree. *See, e.g.*, *Am. Ass'n of Univ. Professors v. Rubio*, --- F. Supp. 3d ----, 2025 WL 2777659, at *10-11 (D. Mass. Sept. 30, 2025) ("*AAUP*").

Third, Defendants' actions to purportedly revoke Mr. Ahmed's status as a legal permanent resident and to potentially remove him would cause him serious injury. Perhaps most seriously, Defendants' actions, if given effect, would jeopardize Mr. Ahmed's status as a legal permanent resident and potentially tear him apart from his wife and child, who are U.S. citizens. Moreover, Mr. Ahmed faces the possibility of being transferred out of this district, as Defendants have done to a number of other individuals who have been targeted for their speech in the last year. *See id.* at *35 (describing ICE attempt to fly an individual "out of the district" of Vermont to Louisiana); *Ozturk v. Hyde*, 136 F.4th 382, 389 (2d Cir. 2025) (describing federal officials' efforts to transport

individual from Massachusetts to New Hampshire, then to Vermont, and then to Louisiana).

2. *Defendants' Actions Constitute Unlawful Viewpoint Discrimination*

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641-643 (1994)). Defendants' actions here constitute textbook viewpoint discrimination since they "require[] recipients to take the government's side on a particular issue." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 235 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013). Specifically, Defendants are punishing Mr. Ahmed for his work reporting on antisemitism, hate speech, and disinformation on social media platforms and for CCDH's support of UK and EU digital transparency and consumer protection laws. While claiming that their actions will combat supposed "censorship," Defendants flip the First Amendment on its head, achieving their goals by trying to silence individuals like Mr. Ahmed who express or uncover speech that may be inconvenient for Defendants or their allies. Indeed, Defendants' actions run exactly counter to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," and that it may sometimes involve "unpleasantly sharp attacks on government and public officials"—or their corporate allies. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Defendants' purported sanctions against Mr. Ahmed cannot withstand the strict scrutiny applied to viewpoint discrimination. As discussed above, Defendants' actions are based on Mr. Ahmed's "core political speech," so the importance of the First Amendment's protections "is at its zenith." *Meyer*, 486 U.S. at 422, 425. Although Defendants have pointed to vague "foreign policy consequences" as a justification for their actions, "concerns of national security and foreign relations do not warrant abdication of the judicial role" in applying the First Amendment's

protections. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010); *see also N.Y. Times Co. v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment."); *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986) ("The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless. … It is the duty of the courts, in cases properly before them, to say where [the] statutory and constitutional boundaries lie."). And even if such unspecified concerns could amount to a compelling state interest, Defendants' actions—essentially banning people whose views on the importance of combating antisemitism online and supporting transparency and consumer protection laws differ from those in the White House and their allies—are not even close to being sufficiently narrowly tailored to address supposed concerns about censorship or foreign policy consequences. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 395-96 (1992) (municipal ordinance that discriminated based on viewpoint was not "narrowly tailored to serve compelling state interests" when the ordinance was meant to "display[] the [government's] special hostility" toward that viewpoint). Moreover, Defendants' actions also deprive listeners, including U.S. citizens, of their right to hear Mr. Ahmed's speech. *See Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) ("It is … well established that the Constitution protects the right to receive information and ideas.") (citing *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)).

    As noted above, these principles apply with full force to citizens and non-citizens alike. *AAUP*, 2025 WL 2777659, at *46; *Bridges II*, 326 U.S. at 162 (Murphy, J., concurring) ("[T]he First Amendment and other portions of the Bill of Rights make no exception in favor of deportation laws or laws enacted pursuant to a 'plenary' power of the Government."). In fact, when confronted with the Trump Administration's recent policy to strip individuals of immigration protections and

remove them from the country based on their speech, courts across the country have consistently

held that the First Amendment protects non-citizen residents from viewpoint discrimination. *See,*

*e.g.*, *Mohammed H. v. Trump*, 2025 WL 1692739, at *3 (D. Minn. June 17, 2025); *Aditya W.H. v.*

*Trump*, 2025 WL 1420131, at *10 (D. Minn. May 14, 2025); *Ercelik v. Hyde*, 2025 WL 1361543,

at *10 (D. Mass. May 8, 2025); *Mahdawi v. Trump*, 2025 WL 1243135, at *9 (D. Vt. Apr. 30,

2025); *Öztürk v. Trump*, 2025 WL 1145250, at *18 (D. Vt. Apr. 18, 2025).

**B.    Mr. Ahmed's Detention Would Violate Due Process**

"The Constitution establishes due process rights for 'all "persons" within the United States,

including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.'"

*Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693

(2001)). "The essence of due process is the requirement that 'a person in jeopardy of serious loss

(be given) notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge*, 424

U.S. 319, 348-49 (1976) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-172

(1951) (Frankfurter, J., concurring)). Defendants have already purported to impose restrictions on

Mr. Ahmed's ability to enter and remain in the country without any notice. And given the

Defendants' efforts over the last year to detain and transfer individuals without warning based on

their speech, it appears likely that Defendants will attempt to do the same to Mr. Ahmed. Entering

a temporary restraining order would ensure that Mr. Ahmed is not deprived of his constitutional

rights to notice and an opportunity to be heard before Defendants seek to detain and remove him.

**C.    Defendants' Actions Are Arbitrary and Capricious in Violation of the APA**

A court shall "hold unlawful and set aside" a final agency action if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to

constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority,

or limitations, or short of statutory right," or "without observance of procedure required by law."

5 U.S.C. § 706(2)(A)-(D).  As stated above, Defendants' actions against Mr. Ahmed violate his constitutional rights under the First and Fifth Amendments, *see supra* at 10-15, thus they should be set aside as contrary to constitutional right, power, privilege, or immunity.  *Cf. AAUP*, 2025 WL 2777659, at *52 ("nothing in the text, history, or tradition of the First Amendment suggests that persons lawfully present here may be subject to adverse action based on their political speech ….").

Defendants' actions to purportedly revoke Mr. Ahmed's green card are also arbitrary and capricious.  As reports from multiple news outlets in the previous weeks make clear, Defendants' invocation of supposed foreign policy concerns are nothing more than a pretext for a decision that was taken to retaliate against the EU for its regulatory actions against X and as punishment for Mr. Ahmed's protected speech.[8]  In fact, those reports not only noted that the federal government would take immigration actions against certain non-citizens as a retaliatory measure against the EU; they specifically identify Mr. Ahmed as one of the proposed targets.  Though the State Department's press release points to "foreign policy consequences" to justify their actions if the targeted individuals remain in the United States, they do not explain what kinds of "foreign policy consequences" might possibly arise, nor how any such consequences are connected to the targeted individuals' presence in the United States.  In other words, Defendants entirely fail to show that they have any "reasonable ground to believe" that there could be any "potentially serious adverse foreign policy consequences" to Mr. Ahmed's continued presence in the United States, as the statute requires.  *See* 8 U.S.C. § 1227(a)(4)(C)(i).  And Defendants' public statements after the

---

[8] Trice Decl., Ex. D, Prem Thakker & Asawin Suebsaeng, *SCOOP: Trump Admin Is Preparing to Revoke Visas of Critics of Elon Musk's Twitter*, Zeteo (Dec. 11, 2025), https://zeteo.com/p/trump-revoke-visas-breton-ahmed-twitter-musk; Trice Decl., Ex. E, Connor Stringer, *Trump to deport boss of Starmer-linked charity*, The Telegraph (Nov. 9, 2025), https://www.telegraph.co.uk/us/news/2025/11/09/trump-to-expel-boss-of-labour-linked-ngo/.

announcement of their actions only reinforce that supposed "foreign policy consequences" are not the real reason for their actions. For example, Defendant Rogers posted on X that Mr. Ahmed was being targeted because of CCDH's reporting on anti-vaccine disinformation, and supposed internal organizational priorities focused on X. Ex. A. And Musk, who owns X, expressed his glee at the Defendants' action earlier today, posting "This is so great," in response to another user discussing the news.[9]

Defendants' efforts to change Mr. Ahmed's immigration status and remove him from the country are particularly ironic given Mr. Ahmed's history of countering antisemitism online and the federal government's focus on combating antisemitism as a justification to detain and attempt to expel other non-citizens based on their speech in the last year. *AAUP*, 2025 WL 2777659, at *6-35 (detailing government statements and executive orders seeking to combat antisemitism, as well as arrests, detention, and removal efforts against non-citizens for their alleged speech relating to Israel, Palestine, and/or Hamas). For years, Mr. Ahmed and CCDH have been at the forefront of reporting on and calling out antisemitism on social media platforms, even working with the first Trump Administration to do so.[10] But while the Defendants used antisemitism to justify crackdowns on students' speech earlier this year, they have used Mr. Ahmed's criticism of the antisemitism that runs rampant on X to target him based on nebulous "foreign policy consequences." Defendants' rank hypocrisy makes clear that their actions are arbitrary and capricious.

## II.    MR. AHMED WOULD SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

---

[9]  Trice Decl., Ex. I, X.com, Elon Musk, @elonmusk (Dec. 24, 2025) (2:27 a.m.), https://x.com/elonmusk/status/2003729167452635372?s=20.

[10]  Trice Decl., Ex. F, *Ancient Hatred, Modern Medium: Conference on Internet Anti-Semitism*, U.S. Dep't of State, https://2017-2021.state.gov/anti-semitism-conference/.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Coscarelli v. ESquared Hosp. LLC,* 364 F. Supp. 3d 207, 221-22 (S.D.N.Y. 2019) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  Absent injunctive relief, Mr. Ahmed faces irreparable harm in the form of ongoing and imminent violations of his constitutional rights.  The Supreme Court and the Second Circuit have long held that the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury" as a matter of law.  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Once a plaintiff shows a likely First Amendment violation, the court presumes irreparable harm and requires no further showing.  *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm"); *see also Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) (same).

That principle does not turn on citizenship status.  Courts in this circuit have repeatedly held that the deprivation of a non-citizen's constitutional liberties constitutes irreparable harm in its own right.  *See Velesaca v. Decker*, 458 F. Supp. 3d 224, 240-41 (S.D.N.Y. 2020) (collecting cases).  Courts confronting immigration enforcement used to suppress protected speech have likewise recognized the irreparable nature of the resulting injuries.  In *American Association of University Professors v. Rubio*, the court emphasized that chilled academic and political expression, combined with the threat of detention and removal, inflicts ongoing constitutional and liberty harms that cannot be undone after the fact and therefore require prospective injunctive relief.  780 F. Supp. 3d 350, 385-86 (D. Mass. 2025).  That conclusion accords with decisions in this circuit holding that the deprivation of liberty inherent in civil immigration detention constitutes irreparable harm.  *Velasco Lopez v. Decker*, 978 F.3d 842, 855 (2d Cir. 2020) (describing civil

immigration detention as a "significant deprivation of liberty that requires due process protection" (quoting *Jones v. United States*, 463 U.S. 354, 361 (1983))).

Mr. Ahmed also faces distinct and irreparable reputational harm. His work depends on credibility, public trust, and the confidence of institutional partners, journalists, and civil-society organizations. Government action that targets him for protected speech—or associates him with threats to public safety or national security—inflicts a stigma that undermines his professional standing and institutional relationships. Courts have recognized that such government-imposed reputational injury, particularly where it affects career prospects and chills speech, constitutes irreparable harm not compensable by damages. *See Khalil v. Trump*, 786 F. Supp. 3d 871, 876 (D.N.J. 2025); *see also Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("Irreparable harm means injury for which a monetary award cannot be adequate compensation" (internal quotation marks omitted)). The government's actions permanently damage Mr. Ahmed's credibility, and no later relief can repair that harm.

Moreover, the federal government has taken the position in other litigation that where it invokes the Foreign Policy Ground as a basis for deportation, a noncitizen is not permitted to seek review of his custody determination before an immigration judge. *See* O*pp'n to Mot. for Release under* Lucas v. Haaden *and* Mapp v. Reno, *Khalil v. Trump*, No. 25 Civ. 1963 (D.N.J. Mar. 23, 2025), ECF 99, n.5. It stands to reason that the government would adopt the same position in Mr. Ahmed's case if he were detained, all but barring him from a meaningful ability to administratively seek release, and making the relief sought herein all the more critical.

Where, as here, detention and removal threaten to chill protected speech and cannot be undone after the fact, irreparable harm is not merely speculative—it is inevitable absent immediate injunctive relief.

### III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

"Under the last injunction factor, [courts] must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Yang v. Kosinski*, 960 F.3d 119, 135-36 (2d Cir. 2020). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). These two factors weigh overwhelmingly in favor of enjoining Defendants from unlawfully detaining Mr. Ahmed or transferring him outside of this District before he can be heard on his constitutional and APA claims.

First and foremost, there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id*. (internal quotation marks omitted); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("[T]here is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority."); *New York v. D.H.S.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020). Defendants acted unlawfully in purporting to unilaterally alter Mr. Ahmed's immigration status, bar him from entry to the United States, and subject him to removal proceedings. *See supra* at 10-17. Mr. Ahmed's likelihood of success "is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12; *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019).

Moreover, the public interest is "best served by ensuring the constitutional rights of persons within the United States are upheld." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) (quoting *Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2013)). In fact, the Second Circuit has explicitly stated that "securing First Amendment rights is in the public interest," where a plaintiff sought a preliminary injunction to halt enforcement of a law that the plaintiff argued infringed on its speech rights. *N.Y. Progress*, 733 F.3d at 488.

The only "public" interest Defendants can cite to support the purported revocation of Mr. Ahmed's green card is to stop supposed "censorship crackdowns by foreign states … targeting American speakers and American companies." Ex. B. Defendants' action here is the height of hypocrisy, claiming to take on supposed "censorship" by barring and/or removing individuals because of their speech. Mr. Ahmed has spent his time in the United States shining a light on the growing antisemitism and hate speech permeating social media platforms. To the extent there could be a public interest in the government removing individuals over their speech, *but see* U.S. Const. amend. I, that interest cannot extend to defending antisemitic speech in the face of speech calling out antisemitism.

The equities also clearly favor Mr. Ahmed and warrant a temporary restraining order. Whereas public reporting reflects that Defendants have been considering taking this action against Mr. Ahmed for no fewer than *six weeks*, *see* Exs. D & E, they did not announce their decision until December 23rd, just hours before Christmas Eve and two days before the Christmas holiday, which Mr. Ahmed had hoped to spend with his wife and child. In contrast, Mr. Ahmed is diligently submitting this request to the Court on Christmas Eve, the day after Defendants announced their action against him, to defend his rights and ensure he can receive an opportunity to be heard.

## CONCLUSION

For the reasons provided herein, the Court should grant Plaintiff's motion for a temporary restraining order.[11]


Dated: December 24, 2025                        Respectfully submitted,
          New York, New York


                                                */s/ Roberta A. Kaplan*
                                                Roberta A. Kaplan
                                                D. Brandon Trice
                                                Maximilian T. Crema
                                                Michael P. Quinn
                                                Avita Anand
                                                KAPLAN MARTIN LLP
                                                1133 Avenue of the Americas | Suite 1500
                                                New York, NY 10036
                                                Tel.: (212) 316-9500
                                                rkaplan@kaplanmartin.com
                                                btrice@kaplanmartin.com
                                                mcrema@kaplanmartin.com
                                                mquinn@kaplanmartin.com
                                                aanand@kaplanmartin.com


                                                */s/ Christopher J. Clark*
                                                Christopher J. Clark
                                                Andrew J. Rodgers
                                                CLARK SMITH VILLAZOR LLP
                                                666 Third Avenue, 21st Floor
                                                New York, NY 10019
                                                Tel: (212) 377-0850
                                                clark@csvllp.com
                                                andrew.rodgers@csvllp.com

---

[11] As reflected in the Proposed Order filed herewith, Mr. Ahmed also requests that the Court require Defendants to provide sufficient advance notice to the Court and counsel, should they seek to detain Mr. Ahmed on any other asserted basis pending the Court's decision on a preliminary injunction, to enable Mr. Ahmed an opportunity to be heard regarding whether any such asserted basis for detention constitutes a pretext for First Amendment retaliation or raises other, related constitutional problems.

/s/ Norman Eisen
Norman Eisen**
Stephen Jonas**
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

** *pro hac vice* pending


/s/ Jesse M. Bless
Jesse M. Bless*
MA Bar # 660713
Bless Litigation LLC
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

*Motion to appear Pro Hac Vice forthcoming*


*Attorneys for Plaintiff Imran Ahmed*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1, I hereby certify that, according to the word count provided by Microsoft Word, the total number of words in this brief is 7,128, which complies with the word count limit of 8,750 words permitted by Local Civil Rule 7.1(c).

Dated:  December 24, 2025

/s/ Roberta A. Kaplan
Roberta A. Kaplan