## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IMRAN AHMED,<br><br>*Plaintiff*,<br><br>v.<br><br>MARCO RUBIO, in his official capacity as Secretary of State, SARAH B. ROGERS, in her official capacity as Under Secretary of State for Public Diplomacy, PAMELA BONDI, in her official capacity as Attorney General, KRISTI NOEM, in her official capacity as Secretary of Homeland Security, TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, and JUDITH ALMODOVAR, in her official capacity as Acting Field Office Director of the New York Immigration and Customs Enforcement Office,<br><br>*Defendants*. | Case No. 25 Civ. 10705 (LAP)<br><br>**AMENDED COMPLAINT** |

Plaintiff Imran Ahmed files this complaint against Defendants Marco Rubio, in his official capacity as Secretary of State, Sarah B. Rogers, in her official capacity as Under Secretary of State for Public Diplomacy, Pamela Bondi, in her official capacity as Attorney General, Kristi Noem, in her official capacity as Secretary of Homeland Security, Todd M. Lyons, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, and Judith Almodovar, in her official capacity as Acting Field Office Director of the New York Immigration and Customs Enforcement Office, and alleges as follows:

### INTRODUCTION

1.     This case arises out of the federal government's latest attempt to abuse the immigration system to punish and punitively detain noncitizens for protected speech and silence

viewpoints with which it disagrees.  On December 23, 2025, the day before Christmas Eve, and just one hour before this Court closed for the holidays, the Trump Administration announced that it would move to deport Plaintiff Imran Ahmed, an advocate for human rights and civil liberties online, and a British legal permanent resident of the United States who has lived and worked here for five years with his American wife and American child.  Rather than disguise its retaliatory motive, the federal government was clear that Mr. Ahmed is being "SANCTIONED" as punishment for the research and public reporting carried out by the nonprofit organization that Mr. Ahmed founded and runs, the Center for Countering Digital Hate ("CCDH"), which studies the content moderation policies of major social media companies, including Elon Musk's company, X Corp.  In other words, Mr. Ahmed faces the imminent prospect of unconstitutional arrest, punitive detention, and expulsion for exercising his basic First Amendment rights.  The government's actions are the latest in a string of escalating and unjustifiable assaults on the First Amendment and other rights, one that cannot stand basic legal scrutiny.  Simply put, immigration enforcement—here, immigration detention and threatened deportation—may not be used as a tool to punish noncitizen speakers who express views disfavored by the current administration.

2.      Mr. Ahmed is a lawful permanent resident and lives in the United States with his wife, who is a U.S. citizen, and their young child, who is also a U.S. citizen.  He founded and runs CCDH, a nonprofit organization with the mission of protecting human rights and civil liberties online.  CCDH conducts research and publishes publicly available reports about the content moderation policies and practices of major social media platforms, including with respect to topics of paramount importance, such as violence and suicide committed by minors, hate speech, vaccinations, mental health, violence against women and children, reproductive health care, and climate change.

3.    On December 23, 2025, the federal government announced that it had taken steps to impose visa restrictions and initiate removal proceedings against certain individuals pursuant to Immigration and Nationality Act ("INA") Section 273(a)(4)(C), 8 U.S.C. § 1227(a)(4)(C).  That same day, Defendant Under Secretary of State Sarah B. Rogers posted on X that her agency had "SANCTIONED: Imran Ahmed," for his work with CCDH.  Under Secretary Rogers tied these sanctions to the speech and advocacy of CCDH, citing the fact that CCDH has (1) publicly reported on the proliferation of anti-vaccine misinformation on social media, and (2) supported the United Kingdom's Online Safety Act and the European Union's Digital Services Act, which promote greater transparency and accountability for social media platforms in monitoring and removing illegal and harmful content.  According to a separate press release by Secretary of State Marco Rubio issued that same day, as a result of these sanctions, Mr. Ahmed is now being subjected to "visa restrictions" and potential "removal proceedings" and will be "generally barred from entering the United States."  Put another way, Mr. Ahmed, a lawful permanent resident, now faces the imminent prospect of unconstitutional arrest, punitive detention, and expulsion from his home country away from his wife and child for exercising his basic First Amendment rights.

4.    Public statements by Secretary Rubio and Under Secretary Rogers, as well as other administration officials, across press appearances, social media postings, and interviews, reveal that the stated justification for targeting Mr. Ahmed changed repeatedly depending on the audience and political context, but boil down to the government using its immigration powers to silence viewpoints.  In the days and weeks following the announcement of sanctions against Mr. Ahmed, officials across the Administration publicly offered a series of inconsistent and shifting explanations for why he was targeted.  Senior officials variously described the sanctions as punishment for alleged "extraterritorial censorship of Americans," as a response to CCDH's prior

reporting on online hate and misinformation, as retaliation for CCDH's advocacy for data privacy and transparency legislation, as necessary to address "interest[s] of U.S. foreign policy," and as part of a broader effort to dismantle what they termed the "censorship-NGO ecosystem." These evolving rationales not only demonstrate that the government lacks a coherent basis for its actions, and to the extent the government has a reason for its actions at all, it is fundamentally that the administration does not like Mr. Ahmed (and CCDH's) constitutionally protected speech. Indeed, all of these contradictions converge on a single point: the government using its immigration power as a tool to silence Mr. Ahmed's protected views.

5.      The sparse Administrative Record produced by the government to date only heightens these First Amendment concerns. Far from supplying a consistent, let alone lawful, basis for the INA § 237(a)(4)(C) foreign-policy removal determination against Mr. Ahmed, the record confirms that the government relied on Mr. Ahmed's lawful speech, research, and advocacy. It also confirms that the government's punitive action against Mr. Ahmed was a direct "response" to a fine imposed on Elon Musk's X Corp. The Record cites "serious adverse foreign policy consequences" attributable to Mr. Ahmed's presence or activities but provides no evidence or supporting documents, nor does it describe these so-called "consequences." The Administrative Record reveals that the determination was driven by disagreement with Mr. Ahmed's viewpoints rather than by any legitimate statutory ground.[1]

6.      The government's shocking actions against Mr. Ahmed form part of a larger pattern of attempted repression of constitutionally protected speech. In case after case, the federal

---

[1] The Administrative Record produced by Defendants on February 6, 2026 (ECF 42), pursuant to the Court's order, (ECF 32, 41), is incomplete, and the limited documents that have been produced contain redactions that Plaintiff believes are improper. Plaintiff intends to seek relief from the Court if the parties are unable to come to a resolution.

government has sought to use its immigration enforcement power as a bludgeon to silence voices and prevent disfavored speech.  As perhaps the most immediate and telling example from the Second Circuit, Rumeysa Ozturk, a legally present noncitizen, was arrested in retaliation for her protected speech and forced to endure unlawful detention, thousands of miles away from her community, support network, and legal counsel.

7.     This contravenes the basic principles embodied in our Constitution.    The government has no power to punish Mr. Ahmed for his research, protected speech, and advocacy, and Defendants cannot evade those constitutional limitations by simply claiming that Mr. Ahmed's presence or activities have "potentially serious adverse foreign policy consequences for the United States."  Defendants' actions violate Mr. Ahmed's rights under the First Amendment and Fifth Amendment of the U.S. Constitution, the Administrative Procedure Act ("APA"), the INA, and its own policies.  This Court should vacate and set aside the Defendants' efforts to target Mr. Ahmed, declare Defendants' actions to be illegal, enjoin Defendants from arresting, detaining, transferring, or deporting Mr. Ahmed from this district unless Defendants establish that their actions are lawful and do not violate the Constitution's protections against retaliation and discrimination.

## PARTIES

8.     Plaintiff Imran Ahmed is a legal permanent resident of the United States. Mr. Ahmed lives in Washington D.C. with his wife and child.  He was physically present in New York City both on the date that this case was commenced and today, where the New York ICE Field Office would detain him, and while he is not present in New York City at all times, he is regularly here for business and personal reasons, as set forth below.

9.     Defendant Marco Rubio is named in his official capacity as the Secretary of State of the United States.  His address is the United States Department of State, 2201 C Street, NW,

Washington D.C. 20520.

10.     Defendant Sarah B. Rogers, is named in her official capacity as Under Secretary of State for Public Diplomacy.  Her address is the United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

11.     Defendant Pamela Bondi is named in her official capacity as the Attorney General of the United States.  Her address is the U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington D.C. 20530.

12.     Defendant Kristi Noem is named in her official capacity as the Secretary of Homeland Security.  Her address is the U.S. Department of Homeland Security ("DHS"), Office of the General Counsel, 2707 Martin Luther King Jr. Ave, SE, Washington D.C. 20528.

13.     Defendant Todd M. Lyons is named in his official capacity as the Acting Director of Immigration and Customs Enforcement.  His address is Office of the Principal Legal Advisor, 500 12th St. NW, Mail Stop 5900, Washington D.C. 20536.

14.     Defendant Judith Almodovar is named in her official capacity as the Acting Filed Office Direct of the New York Field Office for ICE within the United States Department of Homeland Security.  Her address is the New York ICE filed Office Director, 26 Federal Plaza, New York, New York 10278.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Constitution of the United States because this case presents a federal question under the laws of the United States, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.  This Court has remedial authority including pursuant to the APA, 5 U.S.C. §§ 705, 706; the All Writs Act, 28 U.S.C. § 1651; its inherent authority; the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and Rules 57 and 65 of the

Federal Rules of Civil Procedure.

16.     Venue is proper in this Court under 28 U.S.C § 1391(b)(2) and 1391(e)(1). A substantial part of the events giving rise to Mr. Ahmed's claims occurred in this district, including the imminent threat of detention by the New York ICE Field Office and actions taken by Director Almodovar, who resides in this district.

17.     Although Mr. Ahmed maintains a residence in Washington, D.C., he is frequently present in New York for both professional and personal reasons, including ongoing business obligations and longstanding legal representation, and was physically present in New York City on December 24, 2025, when this case was filed, and today, February 12, 2026. Mr. Ahmed visits New York City frequently to meet with donors, to confer with CCDH board members who live in the City, and for multiple other personal and professional reasons that regularly bring him here. Mr. Ahmed also frequently lectures in New York on topics related to CCDH's advocacy and research, including just last week on February 5, 2026, when Mr. Ahmed was invited to give a presentation on social media disinformation at Columbia University's School of International and Public Affairs.

18.     In the hours immediately following Secretary Rubio's December 23, 2025 public announcement, Mr. Ahmed—facing sudden, extraordinary uncertainty and fearing detention—immediately contacted undersigned counsel, Roberta A. Kaplan, who is based in this district and has represented him for years.

19.     Given the New York ICE Field Office's anticipated involvement and ICE field office's documented practice of rapidly initiating enforcement actions, counsel reasonably concluded that immediate filing in this district was necessary to prevent the risk of Mr. Ahmed being taken into custody without warning. At the time this action was initiated, Mr. Ahmed was

physically present in New York City, in close consultation with counsel regarding the Administration's retaliatory actions.

20.    Accordingly, venue lies in this district because (i) the threatened detention and enforcement action would occur here; (ii) a defendant resides in this district; and (iii) a substantial part of the events giving rise to this action occurred within this district.

## BACKGROUND

### A.    Mr. Ahmed Founds CCDH to Prevent Online Discrimination and Hate

21.    Mr. Ahmed is a citizen of the United Kingdom and lawful permanent resident of the United States.  He moved to the United States from the United Kingdom in 2021 with an O-1 Visa, a visa for immigrants who possess "extraordinary ability in the sciences, arts, education, business, or athletics."  8 U.S.C. § 1101(a)(15)(O).  Mr. Ahmed received the O-1 visa on January 8, 2021.  Mr. Ahmed applied for an adjustment of status, submitting an application for legal permanent resident status.  His application was granted (i.e., he received a "green card") on March 29, 2024, and he is now a legal permanent resident of the United States.  Mr. Ahmed is married to a U.S. citizen and his child is a U.S. citizen.

22.    Mr. Ahmed was born in Manchester, England, in 1978, and attended Manchester Grammar School.  His family is Pashtun, one of the largest ethnic groups in Afghanistan.

23.    Mr. Ahmed turned twenty-three on September 12, 2001.  The Taliban were Pashtun, and Mr. Ahmed felt a strong sense of purpose to devote his life to addressing evil in the world.  He returned to formal study and earned a degree in politics from the University of Cambridge before embarking on a long career in public service and political strategy within the United Kingdom's Labour Party.

24.    In 2016, while working in British politics, Mr. Ahmed grew concerned by the rise in antisemitism and racism across the United Kingdom, where he was living at the time.  He

observed a sharp rise in antisemitism, xenophobia, and far-right organizing in the United Kingdon, particularly during the campaign surrounding the Brexit referendum and when the far-right party, Britain First, launched the dangerous conspiracy theory that the EU was attempting to import Muslims and Black people to "destroy" white citizens.

25.     In November 2016, Jo Cox, a Member of Parliament and Mr. Ahmed's colleague, was shot and stabbed in a brutal politically motivated murder, by a man who screamed "Britain first" and "keep Britain independent" during the attack.  Ms. Cox's killer was alleged to have accessed several websites about the Nazis, the Ku Klux Klan, the Waffen-SS, and Israel on the days before killing Cox.

26.     Inspired and devastated by this tragedy, Mr. Ahmed formed the CCDH in 2019 to call attention to the enormous problem of digitally driven disinformation and hate online.

**B.     CCDH's Work to Prevent the Spread of Online Hate and Disinformation**

27.     CCDH is a nonprofit organization that works to stop the spread of online hate and disinformation through innovative research, public campaigns, and policy advocacy.  Its mission is to protect human rights and civil liberties online.

28.     By developing an understanding of the online harm landscape that exists on social media platforms, CCDH has demonstrated how social media algorithms can pose real life harms to marginalized communities, minors, and democracy more broadly.

29.     CCDH works towards better online spaces that promote truth, democracy, and are safe for all with the goal of increasing economic and reputational costs for the platforms that facilitate the spread of hate and disinformation. It has published reports on a variety of topics to further their ultimate mission of reducing hate online and its real-world impacts.  For example:

        a.   CCDH publishes a free Parents Guide, a downloadable document to help parents understand what kids are exposed to online, how to set boundaries, how

to have conversations about what they see online, and where to find additional resources.[2]

b.   CCDH has conducted wide ranging investigations into Meta, TikTok, YouTube, and AI tools to document children users' exposure to abuse, self-harm, eating disorders, drugs, and extremist content.  CCDH's polling further links social media use to increased susceptibility to extremist and antisemitic beliefs and conspiracy theories, directly linking online child safety to broader concerns about democratic resilience and civic health.  Its findings have been widely cited in court proceedings and complaints brought against Meta.  Its research has also prompted the platforms themselves to modify or remove features.

c.   CCDH also offers Digital & Information Resilience Training for individuals and organizations to better navigate social media and build resilience against online hate.

d.   In March 2021, CCDH published a report entitled the "Disinformation Dozen," which revealed that just twelve individuals were responsible for almost two-thirds of anti-vaccine content circulating on social media platforms.[3]  CCDH found that despite the fact that these twelve individuals repeatedly violated Facebook, Instagram, and Twitter's terms of service agreements, nine remained on all three platforms.  The report also published CCDH's research that social

---

[2] Center for Countering Digital Hate, *Parents Guide: How to Navigate Social Media Safely with Your Kids*, (2025), https://counterhate.com/parents-guide-how-to-navigate-social-media-safely-with-your-kids/.

[3] Center for Countering Digital Hate, *The Disinformation Dozen*, (2021), https://counterhate.com/research/the-disinformation-dozen/.

media platforms in the analyzed time period in 2021 failed to act on 95 percent of the Covid and vaccine misinformation reported to them and in fact there was some evidence that the algorithms actively recommended similar misinformation.

e.   CCDH has also worked to draw attention to harmful content that social media and online search companies often end up pushing to children.  For example, a December 2022 report examined how TikTok's algorithm recommends suicide, self-harm, and eating disorder content to teen users within minutes of their signing up for an account.[4]

f.   In April 2023, CCDH published a report co-authored with the Anti-Defamation League entitled "How Iran's Press TV Uses Social Media to Promote Anti-Jewish Hatred."[5] The report exposed how a foreign state was using state-controlled media to promote dangerous antisemitism, Holocaust denial, and hateful views about LGBTQ+ and women's rights through social media platforms to millions across the world.

g.   In 2025, CCDH published a 55-page report containing the results from a large-scale safety test it conducted by setting up teen accounts on ChatGPT.[6]  The

---

[4] Center for Countering Digital Hate, *Deadly by Design* (2022), https://counterhate.com/research/deadly-by-design/.

[5] Center for Countering Digital Hate, *Iranian state TV using social media to evade broadcast bans and spread antisemitic hate campaigns, new report finds*, (2023) https://counterhate.com/blog/new-report-state-hate/.

[6] Center for Countering Digital Hate, *Fake Friend, How ChatGPT Betrays Vulnerable Teens by Encouraging Dangerous Behavior* (2025), https://counterhate.com/wp-content/uploads/2025/08/Fake-Friend_CCDH_FINAL-12Sep.pdf.  Researchers at CCDH developed three 13-year-old personalities and registered free ChatGPT accounts in their names, ages, and locations within the United States.

results were highly alarming. Within two minutes of interacting with ChatGPT, the program gave clear instructions to a 13-year old teen on how she should cut herself, and within 12 minutes it advised another teen on the exact quantities of MDMA and alcohol to mix for a "crossfading" effect. Within 40 minutes, ChatGPT gave a teen specific doses of multiple medications that a 13-year-old girl weighing 110 pounds would need to ingest to overdose. In an hour, it wrote a complete suicide plan for a teen including the suicide note he should leave and the step-by-step plan he should use to prepare his bedroom and computer to be discovered by his parents after his death.

h.   Another 2025 report published by CCDH in partnership with The Jewish Federations of North America focused on the proliferation of antisemitism and hate speech on social media and 11 Instagram accounts that were openly selling "hate merchandise" on e-commerce systems.[7] Over six months, the number of views the accounts received jumped from 220 million views to 826 million views. CCDH's research showed that the spike in views—and in sales of the "hate merch"—directly corresponded with sweeping policy reforms that Meta implemented, which rolled back earlier safeguards that detected and stopped the spread of hate speech and hate accounts.[8]

30.   CCDH was one of the original supporters of the United Kingdom's Online Safety

---

[7] Center for Countering Digital Hate, *Hate for Sale: How Instagram Enables Sellers of Hateful Merchandise to Reach a Billion Views* (2025), https://counterhate.com/wp-content/uploads/2025/11/Hate-for-Sale-Final.pdf.

[8] Examples of merchandise include two t-shirts: one stamped with a reimagined Adidas logo made of three nazi salutes and the "brand" "adidolf," and the other replaced the well-known Nike swoosh with one made of cotton balls above the phrase "Just Pick It." *Hate for Sale* at 14.

Act, which became law in October 2023.  The groundbreaking legislation set the rules for social media and search engine platforms operating in the United Kingdon, requiring them to identify and remove illegal content, conduct risk assessments, and provide a higher level of online protection for children. Mr. Ahmed provided evidence and testimony in support of the bill before Parliament and now regularly advises Ofcom, the United Kingdom's online safety regulator, on how to ensure safety is at the forefront of the government's policies.

31.    CCDH is also a proud supporter of the Digital Services Act (the "DSA"), the 2024 "rulebook" that regulates digital service in the European Union that requires social media and search engine platforms to comply with risk assessment and mitigation efforts.

32.    The DSA addresses the CCDH's STAR Framework, its blueprint for social media platforms' regulation:  Safety by Design, Transparency, Accountability, and Responsibility.  The DSA requires companies to investigate whether platforms are failing to tackle online harms, hate, and misinformation so that they can help mitigate the problems where it exists. The DSA also requires greater transparency of algorithms and advertising across the platforms.  In order to operate in Europe, where there are over 45 million active users, Meta's Facebook and Instagram, X, TikTok, LinkedIn, and YouTube must comply with the DSA's additional requirements.

33.    CCDH has also advocated for reforms to Section 230 of the Communications Decency Act.  Section 230 shields "interactive computer services" from liability for content created and added to websites by another party.[9]  CCDH has discussed how Section 230 was passed when online interactions looked very different from how they do today, and it has advocated for taking a more nuanced approach to liability protections for social media companies to hold

---

[9] Center for Countering Digital Hate, *Understanding Section 230 – Social Media Companies' Get Out of Jail Free Card*, (2024), https://counterhate.com/blog/understanding-section-230-social-media-companies-get-out-of-jail-free-card/.

them accountable for the content that appears on their platforms.

**C.     CCDH Is Sued by X Corp. for Its Work Exposing the Spread of Disinformation and Hate on Social Media**

34.     Unsurprisingly, CCDH's work has drawn retaliation from powerful social media companies.  On July 20, 2023, X Corp., the social media company owned by billionaire Elon Musk, sent a letter to Mr. Ahmed and the CCDH criticizing their reports and threatening litigation under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125.

35.     On July 31, 2023, X Corp. filed a lawsuit in the Northern District of California against the CCDH, presenting two categories of allegations about three specific reports by the CCDH Defendants.

36.     CCDH had done research that was published on the front page of *The New York Times* that showed an increase in hate speech on X since Elon Musk had taken over the social media company.[10]  For example, there was a tripling in the use of the N-word after the change in ownership with people using the word with three times as much frequency the week he took over compared to the daily average the year before.

37.     X Corp. complained that this research had been gathered in alleged violation of various contractual provisions and published without authority.

38.     On March 25, 2024, the Honorable Charles R. Breyer of the United States District Court for the Northern District of California granted CCDH's motion to dismiss, finding that the lawsuit was "unabashedly and vociferously" about "punishing the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948 (N.D. Cal. 2024).  X Corp.

---

[10] Center for Countering Digital Hate, *The Musk Bump: Quantifying the Rise in Hate Speech Under Elon Musk*, (2022), https://*counterhate.com/blog/the-musk-bump-quantifying-the-rise-in-hate-speech-under-elon-musk/*.

has appealed that decision, and that appeal is currently pending before the United States Court of Appeals for the Ninth Circuit.

**D.    The Government's Adverse Actions Against Mr. Ahmed**

39.    On December 4, 2025, the European Commission issued a fine of 120 million euros against X Corp. for violations of the DSA's provisions governing transparency, accessibility, and deceptive practices.

40.    The ruling drew a strong reaction from the Trump Administration, with President Trump describing it as "nasty" and criticizing the European Union for going in "bad directions."[11]

41.    Secretary of State Marco Rubio posted to social media that the ruling was "an attack on all American tech platforms and the American people by foreign governments" and declared that "[t]he days of censoring Americans online are over."



*Figure 1 – December 5, 2025 Social Media Post by Secretary of State Marco Rubio*

42.    On December 23, 2025, Secretary of State Marco Rubio issued a press release announcing that the State Department "is taking decisive action against five individuals" for their protected speech activities.  The press release further announced that Secretary Rubio had made a

---

[11] Reuters, *Trump Calls EU fine on X 'Nasty One,' says Europe Going in 'Bad Directions,'* (Dec. 8, 2025), https://www.reuters.com/business/trump-calls-eu-fine-x-nasty-one-says-europe-going-bad-directions-2025-12-08/.

determination that the individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States" (the "Rubio Declaration") and noted that, under the Rubio Declaration, the Department of Homeland Security "can initiate removal proceedings against certain individuals pursuant to INA section 237(a)(4)(C), which renders such individuals deportable." The press release explained that "[t]hose actions are pursuant to Section 212(a)(3)(C) of the Immigration and Nationality Act" (the "Foreign Policy Ground").



★ ★ ★

## Announcement of Actions to Combat the Global Censorship-Industrial Complex

**PRESS STATEMENT**

**MARCO RUBIO, SECRETARY OF STATE**

DECEMBER 23, 2025

The State Department is taking decisive action against five individuals who have led organized efforts to coerce American platforms to censor, demonetize, and suppress American viewpoints they oppose. These radical activists and weaponized NGOs have advanced censorship crackdowns by foreign states—in each case targeting American speakers and American companies. As such, I have determined that their entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the United States.

Based on these determinations, the Department has taken steps to impose visa restrictions on agents of the global censorship-industrial complex who, as a result, will be generally barred from entering the United States. Further, based on the foreign policy determination, the Department of Homeland Security can initiate removal proceedings against certain individuals pursuant to INA section 237(a)(4)(C), which renders such individuals deportable.

President Trump has been clear that his America First foreign policy rejects violations of American sovereignty. Extraterritorial overreach by foreign censors targeting American speech is no exception. The State Department stands ready and willing to expand today's list if other foreign actors do not reverse course.

*These actions are pursuant to Section 212(a)(3)(C) of the Immigration and Nationality Act, which renders inadmissible any alien whose entry into the Unites States the Secretary of State determines "would have potentially serious adverse foreign policy consequences for the United States." Certain family members may also be covered by these restrictions. In addition, Section 237(a)(4)(C) of the Immigration and Nationality Act renders an alien deportable from the United States if the Secretary of State has reasonable grounds to believe the alien's presence or activities in the United States would have potentially serious adverse foreign policy consequences.*

*Figure 2 - December 23, 2025 Press Statement of Secretary of State Marco Rubio*

43.     That same day, Under Secretary of State Sarah B. Rogers posted on social media: "Today, the United States issued SANCTIONS reinforcing the 'red line' I invoked on @GBNEWS.  Namely: extraterritorial censorship of Americans.  Today's sanctions target the censorship-NGO ecosystem."



*Figure 3 – December 23, 2025 Social Media Post by Under Secretary of State Sarah B. Rogers*

44.     In a separate post, Under Secretary Rogers continued: "WE'VE SANCTIONED: Imran Ahmed, key collaborator with the Biden Administration's effort to weaponize the government against U.S. citizens.  Ahmed's group, Center for Countering Digital Hate (CCDH), created the infamous 'disinformation dozen' report, which called for platforms to deplatform twelve American 'anti-vaxxers', including now-HHS Secretary @SecKennedy." ("Rogers' Post").



> **Under Secretary of State Sarah B. Rogers** ✔ ◎
> @UnderSecPD                                          ...
>
> WE'VE SANCTIONED: Imran Ahmed, key collaborator with the Biden
> Administration's effort to weaponize the government against U.S.
> citizens. Ahmed's group, Center for Countering Digital Hate (CCDH),
> created the infamous "disinformation dozen" report, which called for
> platforms to deplatform twelve American "anti-vaxxers", including now-
> HHS Secretary @SecKennedy. Leaked documents from CCDH show the
> organization listed "kill Musk's Twitter" and "trigger EU and UK
> regulatory action" as priorities. The organization supports the UK's
> Online Safety Act and EU's Digital Services Act to expand censorship in
> Europe and around the world.
>
> 3:46 PM · Dec 23, 2025 · **741.5K** Views

*Figure 4 – December 23, 2025 Social Media Post by Under Secretary of State Sarah B. Rogers*

45.     Under Secretary Rogers also referenced "leaked documents" from CCDH that show that the organization wants to "kill Musk's Twitter" and "trigger EU and UK regulatory action" as supporters of the UK's "Online Safety Act and EU's Digital Services Act."

46.     Also on December 23, 2025, an article was published by Elizabeth Troutman Mitchell at *The Daily Signal*. The article, which describes a State Department document obtained by *The Daily Signal*, notes that Mr. Ahmed is "subject to deportation."[12]  The article further explains: "Due to Secretary of State Marco Rubio's foreign policy determination, the Department of Homeland Security can now initiate removal proceedings." *Id.*

47.     The following day, Under Secretary Rogers made light of the federal government's devastating actions against Mr. Ahmed in a public jibe directed at Morgan McSweeney, then-Chief of Staff to British Prime Minister Keir Starmer and a former director of CCDH. Referencing the government's efforts to deport Mr. Ahmed and separate him from his family on Christmas Eve,

---

[12] Elizabeth Troutman Mitchell, *Exclusive: Trump Bars Global Censorship Agents From Entering US*, Daily Signal (Dec. 23, 2025), https://www.dailysignal.com/2025/12/23/exclusive-trump-bars-five-europeans-accused-on-censoring-american-speech-from-entering-us/.

Under Secretary Rogers reposted on X: "Hey McSweeney. Merry Christmas."



*Figure 5 – December 24, 2025 Social Media Post by Under Secretary of State Sarah B. Rogers*

48.    Elon Musk also posted online to celebrate the administration's actions, reposting an individual's reaction to Under Secretary of State Rogers' post with the comment "This is so great."



*Figure 6 – December 24, 2025 Social Media Post by Elon Musk*

### E.    The Administration's Shifting Explanations for Targeting Mr. Ahmed

49.    From the outset, the Administration has never settled on a single, credible explanation for why it targeted Mr. Ahmed.  As the record below shows, senior officials offered one justification after another—often contradicting themselves from one interview or social media post to the next.  The rationales ranged from claims about "extraterritorial censorship," to allegations of political collaboration with the prior Presidential Administration, to harming an American company, to visa-technicalities, to sweeping theories about a global "censorship-NGO ecosystem," to geopolitical signaling, and even to election conspiracy theories.  The details differ, but the theme is the same: none of these shifting stories provides a lawful basis for the government's actions, and all point to a retaliatory response to Mr. Ahmed's protected speech.

50.    Following Secretary Rubio's December 23, 2025 announcement, senior Administration officials—mainly Under Secretary Rogers—offered a series of inconsistent, contradictory, and shifting rationales for why Mr. Ahmed had been singled out for sanctions and potential deportation.  These public statements, which appeared on X, in televised interviews, in podcast appearances, and in official and unofficial press statements, reveal that the government's

justification for imposing sanctions against Mr. Ahmed changed repeatedly over time.

51.    In her initial public announcement on X, Under Secretary Rogers framed the action as an enforcement of what she termed a "red line," intended to target "extraterritorial censorship of Americans," and "the censorship-NGO ecosystem."  This explanation expressly framed the government's action as a response to alleged foreign "censorship," not to any purported foreign-policy consequence associated with Mr. Ahmed's conduct.  Mr. Ahmed is a researcher and an advocate; he does not have the power to censor anyone.

52.    Within minutes, Under Secretary Rogers made another post explicitly naming Mr. Ahmed as one of the targets of these sanctions.  In that post, however, she publicly adopted a different rationale, claiming that Mr. Ahmed had been sanctioned for domestic political reasons. She wrote: "WE'VE SANCTIONED: Imran Ahmed, key collaborator with the Biden Administration's effort to weaponize the government against U.S. citizens."  Under Secretary Rogers also asserted that CCDH "created the infamous 'disinformation dozen' report" and accused Mr. Ahmed of urging platforms to "deplatform twelve American 'anti-vaxxers.'"  This second explanation bore no obvious connection to the earlier claim of "extraterritorial censorship"— indeed, it expressly focused on Mr. Ahmed's advocacy while in the U.S.—and instead retaliated directly against Mr. Ahmed's protected research and speech.  It also introduced a new theory: that Mr. Ahmed had somehow "collaborated" with the prior Administration, and remarkably, that such "collaboration" with a former Administration elected by the people of the United States could give rise to adverse foreign policy consequences.

53.    In that same post, Under Secretary Rogers also claimed that CCDH sought to harm a U.S. business and had political motives involving foreign regulators.  She asserted: "Leaked documents from CCDH show the organization listed 'kill Musk's Twitter' and 'trigger EU and

UK regulatory action' as priorities."  None of these alleged objectives constitutes grounds for deportation under federal law, and they contradict the prior two rationales.

54.    During subsequent media interviews, Under Secretary Rogers again altered the administration's explanation.  On January 15, 2026, Under Secretary Rogers appeared in a *Disinformation Chronicle* podcast and claimed that the sanction against Mr. Ahmed reflected a "common sense" response to an individual whose purported "purpose" was hostile to American companies.[13]  When the interviewer specifically asked Under Secretary Rogers about the decision to sanction Mr. Ahmed, Under Secretary Rogers answered: "If you showed up at a consulate … and said, my purpose is to kill an American company for the purpose of undermining American political rights … maybe we don't want you to be an invited guest."[14]  She then went further, asserting that Mr. Ahmed was engaged in "collusion with part of the American government and certainly with the British government for the purpose of … interfering in American elections."[15] This extraordinary claim—that Mr. Ahmed, a lawful permanent resident and public-interest researcher, was somehow involved in interfering in American elections—is wholly unsupported, appears nowhere in the Administrative Record, and represents yet another invented and dangerous rationale.  Even more astonishing, Under Secretary Rogers' statement implies that the prior United States administration was itself engaged in dangerous foreign-policy actions or election-related interference, and that Mr. Ahmed is now being punished for those alleged actions.  Under Secretary Rogers' suggestion is as reckless as it is unfounded, and further illustrates the retaliatory and

---

[13] Disinformation Chronicle & Undersecretary of State for Public Diplomacy Sarah Rogers at 6:03, *Disinformation Podcast*, YOUTUBE (Jan. 15, 2026), https://music.youtube.com/watch?v=S431h_jMV98.

[14] *Id.* at 6:18.

[15] *Id.* at 6:40.

pretextual nature of the government's shifting justifications.

55.    Under Secretary Rogers further underscored the improvised and speculative nature of this new theory by openly expressing her hope that the litigation against the government would yield additional incriminating material about Mr. Ahmed.  In the same interview, she stated: "I very much hope that this litigation produces some discovery from CCDH," and emphasized that she was "very, very keen to learn more," even while acknowledging that she did not know whether the case was "postured to" produce such materials.  This admission—that she hoped the lawsuit itself would supply the evidence to justify the government's prior actions—further confirms that the government lacked any legitimate factual basis for sanctioning Mr. Ahmed and was instead searching for post-hoc support for an already-taken retaliatory action.

56.    In the same interview, Under Secretary Rogers offered yet another rationale, downplaying the actions against Mr. Ahmed as a routine visa-discretion decision unrelated to wrongdoing.  She asserted: "There's a whole spectrum of tools. … We didn't impose Magnitsky sanctions. … We have a tool that we refer to as visa sanctions … [and] almost nobody has the right to be an invited guest on a visa in the United States."[16]  Having previously described the sanctions as enforcement of a "red line" and a response to alleged political "collaboration," she now insisted the action was merely an exercise of discretionary visa authority.[17]

57.    Under Secretary Rogers later switched course again, advancing an entirely different geopolitical rationale.  She claimed that sanctioning Mr. Ahmed was intended to send a "very important message" to the United Kingdom regarding its Online Safety Act and the European

---

[16] *Id.* at 5:00.

[17] Under Secretary Rogers's latest "justification" also remarkably implied, by reference to Magnitsky sanctions, that Mr. Ahmed had engaged in human rights abuses or corruption, 22 U.S.C. § 10101, *et seq.*, which of course Defendants have never asserted or provided any so-called evidence for, including in the Administrative Record produced to date.

Union's Digital Services Act.[18]  She stated the sanctions were meant to communicate that "we don't want that conduct here. … Our foreign policy is against that."[19]  In other words, Under Secretary Rogers appears to suggest that sanctioning Ahmed was a way of signaling to UK that the United States could impose country-wide sanctions if it wanted to prevent the Online Safety Act or Digital Services Act from coming to the United States.  Once again, this justification bore no resemblance to any previous claim and further evidences the absence of any coherent, lawful basis for targeting Mr. Ahmed.

58.     Just a few days later, in a January 22, 2026 appearance on *The All-In Podcast* from Davos, the interviewer asked Under Secretary Rogers to elaborate on what she has openly described as a "censorship industrial complex," suggesting that NGOs were "ginning up" foreign regulators, supplying them with examples to pursue, and potentially using European regulatory processes as an "end-run around the First Amendment" because European authorities could censor material that "otherwise cannot be censored in the U.S."[20]  In response, Under Secretary Rogers fully embraced and escalated that narrative.  She stated that "the answer is yes," claiming that "leaked emails" purportedly showed CCDH—"a British NGO"—working with "Democratic politicians in the United States" and foreign officials to "suppress American political speech."[21]  She further asserted that CCDH was "taking government money to get foreign governments to come after American businesses," and alleged a broader effort to "replicate … the EU DSA in a

---

[18] *Disinformation Podcast* at 8:40, YOUTUBE.

[19] *Id.* at 9:00.

[20] The All-In Podcast (@theallinpod), *LIVE from Davos: Under Secretary of State Sarah B. Rogers on the Censorship Industrial Complex* at 34:45, X (Jan. 22, 2026, 2:00 PM), https://x.com/theallinpod/status/201441275047981015.

[21] *Id.* at 35:50.

way that would … dodge the American First Amendment."[22]  These extraordinary accusations—asserting, without evidence, that a U.K.-based civil-society organization was engaged in coordinated schemes with U.S. and foreign officials to suppress domestic political speech and to prompt foreign action against American companies—bear no resemblance to any prior government rationale.  They again reveal that the sanction against Mr. Ahmed rested not on any legitimate foreign-policy consequence, but on the government's ideological hostility to CCDH's viewpoints and research.



*Figure 7 – January 22, 2026 Social Media Post by The All-In Podcast*

---

[22] *Id.* at 36:00.

59.     This pattern is further illuminated by Under Secretary Rogers' public priorities. Just days after these shifting explanations, the State Department announced that Under Secretary Rogers would embark on a February 2026 trip to Ireland, Hungary, Poland, and Germany to "advance freedom of speech and digital freedom" and to press American positions on platform regulation and foreign approaches to online speech.  This itinerary, and the emphasis on exporting her personal vision of "digital freedom," strongly suggests that Mr. Ahmed was swept into Under Secretary Rogers' broader, self-directed campaign to position herself as the Administration's chief antagonist of digital-governance efforts.  In this light, the decision to target Mr. Ahmed appears less like a considered application of statutory criteria and more like a retaliatory act aligned with Under Secretary Rogers' own ideological agenda—and timed to demonstrate her willingness to send a warning message by punishing a critic whose research she opposed.



## Under Secretary Rogers's Travel to Ireland, Hungary, Poland, and Germany

MEDIA NOTE

OFFICE OF THE SPOKESPERSON

FEBRUARY 5, 2026

Under Secretary of State for Public Diplomacy Sarah Rogers will travel to Dublin, Budapest, Warsaw, and Munich February 5-15, 2026. During her upcoming trip, Under Secretary Rogers will meet with government counterparts and private sector leaders to advance freedom of speech and digital freedom, strengthen American economic interests, and highlight American excellence through **Freedom 250** celebrations. Under Secretary Rogers will also attend the Munich Security Conference as part of the U.S. delegation.

*Figure 8 – February 5, 2026 State Department Announcement*

60.     These serially shifting, contradictory public explanations underscore that the government's actions were not grounded in any legitimate statutory purpose.  They demonstrate

instead that the sanction imposed on Mr. Ahmed was retaliatory and motivated by hostility to his protected speech.

**F.    The Administrative Record Contradicts the Public Explanations**

61.    The Administrative Record tells a very different story from the one the Administration offered publicly.  Rather than supporting any of the shifting explanations described above, the record shows that the government's decision was driven by broad domestic policy aims and disagreement with Mr. Ahmed's speech, not by evidence that his "presence or activities" posed any genuine foreign-policy concern.

62.    The Administrative Record, which the government provided with protest and only after two Court orders, shows the sanctioning decision did not arise from any individualized investigation of Mr. Ahmed's conduct, but from a December 16, 2025 "Action Memo" prepared by Under Secretary Rogers framing "response options to the European Commission's fine of X Corp. under the Digital Services Act (DSA)."  ECF 42 at 2.  The memo asked Secretary Rubio to approve a determination that Mr. Ahmed is deportable under INA § 237(a)(4)(C) ("Foreign Policy Ground") as part of the Department's response to the EU's enforcement against X Corp.

63.    The memo's Background section narrates the EU's DSA fine against X Corp. (describing it as asserting "digital sovereignty"), emphasizes DSA obligations on U.S. "Very Large Online Platforms" ("VLOPs"), and characterizes the X Corp. online platform as enabling Europeans to "bypass official EU channels and state-influenced media," thereby "challenging the European Commission's ability to shape the public narrative." *Id.* at 3-4.  This framing culminates in recommended deportability determinations—including for Mr. Ahmed.

64.    A "Subjects Recommended for Deportability Determinations" paper then lists Mr. Ahmed as a recommended target because his advocacy allegedly "undermine[s] the foreign policy objective of the Administration to protect freedom of expression" and "roll[s] back domestic

encroachments on speech," citing a May 2025 "3C policy" and E.O. 14150, "American [sic] First Policy Directive to the Secretary of State." *Id.* at 6. The document makes no finding of national-security risk, criminal conduct, or unlawful activity by Mr. Ahmed; rather, it expressly grounds the Foreign Policy Ground theory in his lawful speech and advocacy regarding content moderation and social media regulatory frameworks.

65.     Secretary Rubio's following determination letter to DHS formalizes this theory: it states that Secretary Rubio has "personally determine[d]" that Mr. Ahmed's "activities and presence" have "potentially serious adverse foreign policy consequences and compromise a compelling U.S. foreign policy interest," and repeats talking points about CCDH's advocacy (e.g., the "Disinformation Dozen" report and support for the U.K. Online Safety Act and the EU DSA) as the basis for Foreign Policy Ground deportability. *Id.* at 8.

66.     Still, contrary to Under Secretary Rogers' public philosophizing, the Administrative Record does not reflect any evaluation of evidence that Mr. Ahmed engaged in "election interference," "collusion," or other wrongdoing. Instead, it catalogues his public advocacy and research, and his organization's positions on platform policies and EU/UK legislation.

67.     These materials directly conflict with the Administration's serial public rationales. The initial "red line" claim of sanctioning "extraterritorial censorship of Americans" finds no evidentiary grounding in the record; rather, the record is linked to the X Corp. and to an abstract policy of "protecting freedom of expression" for Americans—concepts the record itself describes at a high level but never ties to specific, adverse foreign-policy consequences from Mr. Ahmed's presence or activities.

68.     Likewise, the Administrative Record does not touch on Under Secretary Rogers'

later shift to an openly partisan rationale—that Mr. Ahmed supposedly collaborated with a prior Administration to "weaponize" the government. The Department's documents never openly identify any domestic-political collaboration as the deportability basis; instead, they cite Mr. Ahmed's public advocacy about platform policies and EU/UK regulatory measures.

69.    Under Secretary Rogers' further pivot to claims that Mr. Ahmed sought to "kill" an American company, or that he was involved in "interfering in American elections," likewise has no counterpart in the record.  The Administrative Record mentions leaked documents and public campaigns attributed to CCDH, offered to establish that Mr. Ahmed has advocated views that are disfavored by the current Administration—not as evidence of unlawful conduct or concrete foreign-policy effects.  The record supplies no findings of election-related activity by Mr. Ahmed, nor any analytical nexus between his speech and "serious adverse foreign policy consequences."

70.    Under Secretary Rogers' claim that this was merely a routine exercise of visa discretion also contradicts the record.  The Department did not take a visa action; it pursued an INA § 237(a)(4)(C) deportability determination against a U.S. lawful permanent resident, accompanied by a formal transmittal to DHS authorizing use "in immigration court."  That is the antithesis of a simple, discretionary visa refusal.

71.    In short, the Administrative Record, sparse as it is, reveals an ideologically driven, retaliatory and chilling signal built on Mr. Ahmed's lawful speech and associations, not on evidence of any harmful activity, and it cannot be reconciled with the government's shifting public explanations.

## G.    History of the Foreign Policy Ground

72.    The government's retaliation against Mr. Ahmed comes in a broader context of retaliation against other noncitizens who have exercised their First Amendment rights.  Officials at the highest levels of the federal government have made clear that they intend to use immigration

to punish noncitizens who speak out in support of causes the government does not agree with or who are perceived to have engaged in such speech.

73.    8 U.S.C. § 1227 provides the Secretary of State with the authority to refuse entry to noncitizens if he has "reasonable grounds to believe" that their presence or activities "would have potentially serious adverse foreign policy consequences for the United States." *See* U.S.C. § 1227(a)(4)(C)(i) (referencing 8 U.S.C. § 1182(a)(4)(C)(i)).

74.    However, the Secretary of State is expressly forbidden by statute from issuing a policy or decision to deny entry or initiate deportation proceedings based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States."  In such circumstances, the Secretary must "personally determine[]" that admitting the individual or allowing them to remain in the United States would "compromise a compelling U.S. foreign policy interest," 8 U.S.C. § 1182(a)(3)(C)(iii), and then notify certain leaders in Congress of the person's identity and the reasons for the determination, 8 U.S.C. § 1128(a)(3)(C)(iv).

75.    The legislative history confirms that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs.  A Senate Committee report provides that for years "the United States has embarrassed itself by excluding prominent foreigners from visiting the United States solely because of their political beliefs."  The amendments which resulted in the current version of the law were intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States."[23]

---

[23] S. Rep. No. 100-75 at 11, 100th Cong., 1st Sess. (1987) (reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

76.     In a separate House Conference report, Congress made clear that the authority to use this provision should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that "the 'compelling foreign policy interest' standard [should] be interpreted as a significantly higher standard than the general 'potentially serious adverse foreign policy consequences standard.'"[24]

77.     As an example, the same House report on the amendment shared the case of the Shah of Iran as an example where his "mere entry into the United States could [have resulted] in imminent harm to the lives or property of United States persons abroad or to property of the United States government abroad."[25]

## H.    DHS Guidance Concerning First Amendment Activity

78.     In 2019, during the first Trump Administration, DHS Acting Secretary Kevin McAleenan issued guidance to all DHS employees specifically concerning First Amendment protected activities.[26] Per that memorandum, the prior Trump Administration directed that "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights."[27]

79.     In 2021, then-Secretary of Homeland Security Alejandro Mayorkas issued guidance to ICE providing that "[a] noncitizen's exercise of their First Amendment rights …

---

[24] H.R. Conf. Rep. 101-955, at 6793-94, 101st Cong., 2nd Sess. (1990) (reprinted in 1990 U.S.C.C.A.N. 6784).

[25] *Id.* at 6793.

[26] *See* Memorandum from Kevin McAleenan, Sec'y, U.S. Dep't of Homeland Sec., to all DHS Employees (May 17, 2019),
https://www.dhs.gov/sites/default/files/publications/info_regarding_first_amendment_protected_activities_as1_sign ed_05.17.2019.pdf.

[27] *Id.*

should never be a factor in deciding to take enforcement action."[28]  As of the date of filing, the Mayorkas 2021 Guidance remains publicly available on ICE's website.

## I.     The Administration's Pattern of Retaliation Against Other Noncitizens

80.     Over the past year, the Trump Administration has repeatedly employed the same retaliatory playbook against noncitizens whose speech it disfavors.  The playbook is the same every time: first, the administration identifies an individual based on protected advocacy of certain views it dislikes, then ICE arrests the individual suddenly in a public or domestic setting.  The individual is denied any meaningful process and often transferred hundreds or thousands of miles away—often overnight—to remote detention facilities far from their families, communities, and counsel.  Mr. Ahmed has seen this playbook in action.

81.     The most immediate and pressing example is that of Rumeysa Ozturk, a legally present Turkish national and a Ph.D. student at Tufts University.  Her alleged "offense" consisted of co-authoring a student newspaper op-ed criticizing Tufts' response to student calls for divestment from companies connected to Israel's military operations in Gaza.  Federal agents arrested Ms. Ozturk near her home in Massachusetts.  Within hours, they transferred her out of the Northeast entirely and placed her in an immigration detention facility in Louisiana—more than 1,400 miles away—severing her from her academic community, local counsel, and support network.  Government officials publicly characterized her protected speech as "support for Hamas," despite identifying no unlawful conduct.  And just last month, on January 29, 2026, the immigration court held that DHS had not met its burden of proving removability and terminated Ms. Ozturk's removal proceedings.  That outcome is a sobering reminder of how readily

---

[28] *See* Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. Dep't of Homeland Sec., to Tae D. Johnson, Acting Dir., U.S. Immigr. & Customs Enf't 5 (Sept. 30, 2021), https://www.ice.gov/doclib/news/guidelinescivilimmigrationlaw.pdf.

speech-based enforcement can spiral into months of baseless detention.

82.     Ms. Ozturk's case is not an outlier.  In several other recent instances, ICE agents have arrested noncitizens engaged in protected advocacy and then swiftly transported them hundreds or thousands of miles away without notice to counsel and even while litigation was pending in the district where the person was arrested.  These transfers are not incidental; they appear designed to impede judicial review, disrupt legal representation, and magnify the coercive nature of detention.

83.     These arrests do not follow criminal investigations or adjudicated violations of law. They follow speech.   And the transfers are not incidental; they are central to the strategy. Separating detainees from their counsel, even after counsel has appeared or litigation has begun, is how the government attempts to isolate these individuals, disrupt judicial review, and amplify the punitive effect of detention.

84.     Mr. Ahmed now faces that same threat, except this time the threatened actions were announced publicly.  The government's actions in the Rubio Declaration and Rogers' Post fit squarely within this established pattern of retaliatory enforcement—one that uses immigration power not to advance legitimate regulatory goals, but to punish dissent and deter protected speech that the administration or its supports disagree with.

**J.     Unlawful Use of the Foreign Policy Ground Against Mr. Ahmed**

85.     DHS and Secretary Rubio have invoked the Foreign Policy Ground against Mr. Ahmed.  As set forth above, the federal government has made clear that it intends to seek the deportation of Mr. Ahmed.

86.     On December 23, 2025, Secretary Rubio issued the Rubio Declaration announcing that the State Department had made a determination that five individuals' "entry, presence, or activities in the United States have potentially serious adverse foreign policy consequences for the

United States, and noted that the Department of Homeland "can initiate removal proceedings" against these individuals "pursuant to INA § 237(a)(4)(C), which renders such individuals deportable."

87.    That same day, Under Secretary Rogers identified Mr. Ahmed as one of those five individuals.

88.    The federal government has taken the position in other litigation that a noncitizen is not permitted to seek review of his custody determination before an immigration judge where the government invokes the Foreign Policy Provision. *See* Opp'n to Mot. for Release under Lucas v. *Haaden* and *Mapp v. Reno*, *Khalil v. Trump*, No. 25 Civ. 1963 (D.N.J. Mar. 23, 2025), ECF 99, n.5. It stands to reason that the government will adopt the same position in Mr. Ahmed's case once he is in physical detention, all but barring him from any meaningful ability to remain at liberty for months or seek release through administrative avenues, and thereby making the relief sought herein all the more critical to protect against irreparable harm.

89.    Other reporting indicates that the government intends to deport Mr. Ahmed because of his constitutionally protected, past, current, or expected beliefs, statements, or associations.

90.    The applicable statutes expressly prohibit removal based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary "personally determines" that not removing the noncitizen would compromise a compelling U.S. foreign policy interest and provides notice of the same to the individuals identified by statute. *See* 8 U.S.C. § 1227(a)(4)(C)(ii) (incorporating 8 U.S.C. § 1182(a)(3)(C)(iii)).

91.    Plaintiff is not aware of any evidence to indicate that Secretary Rubio has provided the required notification to the chairs of the House Foreign Affairs, Senate Foreign Relations, and

House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).  Certainly, the Administrative Record does not provide any.  And more fundamentally, the invocation of any ground of deportability for Mr. Ahmed's protected speech is unconstitutional.

**K.    Mr. Ahmed Faces Irreparable Harm Without Injunctive Relief From this Court**

92.    Defendants' actions have inflicted irreparable harm on Mr. Ahmed. The prospect of imminent detention, and the commencement of deportation proceedings, has chilled his liberty, free speech, and continued advocacy with CCDH.

93.    If Mr. Ahmed is taken into physical custody, he will be further prevented from expressing the disfavored viewpoints that form the basis of the government's unlawful retaliatory conduct.  And if he is deported without due process, he will be indefinitely separated from his family and community.  Mr. Ahmed's wife and child are citizens of this country and reside in the United States.

94.    Mr. Ahmed also faces a separate and distinct and irreparable reputational harm.  His work depends on credibility, public trust, and the confidence of institutional partners, journalists, and civil-society organizations.  Government action that targets him for protected speech—or associates him with threats to public safety or national security—inflicts a stigma that undermines his professional standing and institutional relationships.

**CAUSES OF ACTION**

**COUNT I**
**Retaliation, Discrimination, Viewpoint, and Prior Restraint**
**(U.S. Constitution, First Amendment)**

95.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

96.     The Foreign Policy Ground laid out in 8 U.S.C. §§ 1227 (a)(4)(C) and 1182(a)(3)(C)(iii) is unconstitutional as a facial matter, and also unconstitutional as applied to Imran Ahmed under the First Amendment, where the government invoked it not to address any concrete "foreign policy consequence," but—as the Administrative Record and Defendants' shifting explanations show—to retaliate against Mr. Ahmed's protected speech, viewpoints, research, and advocacy.

97.     The First Amendment to the U.S. Constitution provides in part that "Congress shall make no law… abridging the freedom of speech… or the right of the people… to petition the Government for a redress of grievances." U.S. Const. Amend. I.

98.     The First Amendment protects past and future speech. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009) ("The first amendment protects speakers from threats of punishment that are designed to discourage future speech."); *Saleh v. City of New York*, 2007 WL 4437167, at *3 (S.D.N.Y Dec. 17, 2007) (noting that First Amendment retaliation claims can be brought "alleging punishment for past speech and those complaining of suppression of future speech"). The First Amendment specifically protects "[t]he rights to complain to public officials and to seek administrative and judicial relief." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994). Its protections extend to actions taken against people in custody, *Gill v. Pidlypchak*, 389 F.3d 379 (2d Cir. 2004), and those threatened with deportation, *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir.

2019) (internal citations omitted), *cert. granted, remanded, and vacated sub nom. on other grounds*, *Pham v. Ragbir*, 141 S. Ct. 227 (2020).

99.     Speech on matters of public concern is entitled to the highest level of protection under the First Amendment.  *See, e.g., Gentile v. State Bar of Nev.*, 501 U.S. 1030 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment.").  Moreover, government action that targets private speech based on the viewpoint taken by the speaker is an egregious form of content discrimination and presumptively unconstitutional. *See Matal v. Tam*, 582 U.S. 218, 234 (2017).

100.     Mr. Ahmed's speech is protected by the First Amendment.  Mr. Ahmed's past speech pertains to matters of prominent public concern, including the ongoing violent hate speech occurring on all social media platforms, criticism of certain legal protections for social media companies, proliferation of disinformation, and advocacy for accountability and transparency online.

101.     Defendants were acutely aware of Mr. Ahmed's speech and viewpoints and explicitly targeted those expressive activities.  The Rubio Determination, the Rogers posts, the multiple podcast interviews, and the Administrative Record all cite CCDH's public reports, advocacy, and viewpoints as the basis for the government's actions.

102.     There is a substantial causal connection between Mr. Ahmed's protected speech and Defendants' adverse actions and threats.  Defendants repeatedly and explicitly linked the Foreign Policy Ground deportability determination to Mr. Ahmed's viewpoints, CCDH's research, and to their personal and ideological disagreement with CCDH's work.  They have contemporaneously offered shifting, mutually inconsistent rationales that underscore the retaliatory animus and lack of any legitimate foreign-policy basis.  Defendants' adverse actions against Mr.

Ahmed are motivated by his past and future exercise, and perceived exercise, of First Amendment-protected speech.  Defendants' actions are intended to silence and discourage Mr. Ahmed from speaking out in the future.

103.    The Rubio Declaration, the Rogers' Post, and the targeting of Mr. Ahmed violate the First Amendment because they:

a.    Retaliate against and punish Mr. Ahmed for his past protected actual and perceived speech;

b.    Prevent him from speaking now (through threat of detention and deportation);

c.    Attempt to chill (through ongoing threat) or prevent (through eventual removal) his future speech in the United States;

d.    Chill others—particularly researchers, NGOs, journalists, and advocates expressing views critical of online hate speech or of the legal protections enjoyed by social media companies—by using immigration power to send a "very important message," as Under Secretary Rogers herself publicly stated, that critical speech may result in visa sanctions, detention, or deportation.

104.    These speech-related consequences are the point of Rubio Declaration, the Rogers' Post, and the government's threatened actions against Mr. Ahmed, and are, in their own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

105.    Defendants' actions against Mr. Ahmed on the basis of Mr. Ahmed's protected speech do not serve a compelling state interest and are not narrowly tailored to any legitimate government interest.  Defendants' actions operate as a prior restraint on his liberty that will prevent Mr. Ahmed from engaging in protected speech.

## COUNT II
### Violation of the Due Process Clause
### (U.S. Constitution, Fifth Amendment)

106.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

107.   The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (*quoting Zadvydas*, 533 U.S. at 693).

108.   The Foreign Policy Ground and its implementation through the administration's past practices, Rubio Declaration, the Rogers' Post, the underlying Administrative Record, and Defendants' threat to deport Mr. Ahmed violate his due process rights under the Fifth Amendment as unconstitutionally vague and violative of Mr. Ahmed's substantive and procedural due process rights.  The administration applied the rationale in an arbitrary, viewpoint-based manner that provides no discernible standard and permitted senior officials to generate shifting, contradictory post-hoc rationales untethered to any evidence of "serious adverse foreign policy consequences."

109.   The Fifth Amendment to the U.S. Constitution requires the government to provide individuals with fair notice of conduct that is prohibited to prevent arbitrary or discriminatory enforcement by government officials.

110.   "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

111.   The Foreign Policy Ground in the INA is unconstitutionally vague, both as a facial matter and as applied specifically to Mr. Ahmed—a lawful permanent resident, living peacefully

in the country, who has engaged and may engage in speech to shed light on the problems of racism, antisemitism, and other hate speech going under or unaddressed on the largest social media platforms in the world.  The government cited no identifiable conduct by Mr. Ahmed that could generate foreign-policy consequences, and instead rested its determination on his lawful speech, his research, and broad complaints about social media regulation and private companies, demonstrating exactly the kind of arbitrary and discriminatory enforcement the Due Process Clause prohibits.

112.    The Fifth Amendment to the U.S. Constitution requires the government to provide individuals with fair notice of conduct that is prohibited to prevent arbitrary or discriminatory enforcement by government officials.

113.    The arbitrary and wrongful nature of the administration's past practices, Rubio Declaration, and the Rogers' Post also violate Mr. Ahmed's substantive due process rights because they are so egregious and outrageous that they may be fairly said to shock the contemporary conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998).  Defendants' conduct—publicly announcing sanctions timed to the holidays, threatening detention based on shifting and unsupported accusations, and using immigration enforcement as a tool to "send a message" to foreign governments—constitutes egregious misuse of federal power.  Mr. Ahmed studies and engages in civic discourse about the content moderation policies of major social media companies in the United States, the United Kingdom, and the European Union.  There is no conceivable foreign policy impact from his speech acts whatsoever.

114.    The Fifth Amendment also requires fair, pre-deprivation process when a person's liberty hangs in the balance, another right Defendants have so far denied Mr. Ahmed by threatening to detain him unlawfully.

115.    The government's threats to detain and deport Mr. Ahmed are wholly unjustified. The government has not demonstrated that Mr. Ahmed—a long-term permanent resident of the United States, with no criminal convictions, and with a wife and young child who are American citizens—needs to be detained.  *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring noncitizen's appearance during removal proceeding and (2) preventing danger to the community).  There is no credible argument for Mr. Ahmed's immigration detention, away from his wife and young child.

**COUNT III**
**Violation of the Immigration and Nationality Act, Administrative Procedure Act, and the**
***Accardi* Doctrine**
**(5 U.S.C. § 706; 8 U.S.C. §§ 1227, 1182)**

116.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

117.    The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech of criticizing online hate.  The Administrative Record and Defendants' public statements together show a policy of punishing disfavored viewpoints and research under the guise of "foreign policy consequences."  This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction, 5 U.S.C. § 706(2)(A)-(B), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaugnessy*, 347 U.S. 260 (1954).

118.    In addition, the Secretary of State's determination that Mr. Ahmed's "presence or activities" would carry "potential serious adverse foreign policy consequences for the United States" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C. § 706(2)(A), (B), (C).  The Secretary of State's personal determination that Mr. Ahmed's protected past, current, or expected speech,

beliefs, statements, or associations may form a basis to deport him because his presence "would have potentially serious adverse foreign policy consequences for the United States" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction.  5 U.S.C. § 706(2)(A), (B), (C).  The Secretary of State's determination is arbitrary and capricious because it rests on shifting, contradictory, and unsupported rationales; relies on lawful speech rather than any cognizable foreign-policy impact; and ignores the statutory requirement to identify "reasonable grounds" that Mr. Ahmed's presence or activities would cause "potentially serious adverse foreign policy consequences."  The Administrative Record shows no such grounds.

### COUNT IV
### Violation of the Non-Delegation Doctrine

119.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

120.    Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement 8 U.S.C. § 1227(a)(4)(C)(i)-(ii) or § 1182(a)(3)(C)(iii).

121.    Congress has delegated discretionary authority that is standardless and unreviewable.

122.    Congress has failed to provide standards or procedures to allow for judicial review of an agency's discretionary deprivation of a noncitizen's liberty.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

      i.      Take jurisdiction over this case;

      ii.      Vacate and set aside the Announcement of Actions to Combat the Global Censorship-Industrial Complex;

      iii.      Vacate and set aside Defendants' unlawful policy of targeting noncitizens

for removal based on First Amendment protected speech;

iv.    Enjoin Defendants from arresting or detaining Mr. Ahmed pending these proceedings;

v.    Enjoin Defendants from transferring Mr. Ahmed away from the jurisdiction of this District pending these proceedings;

vi.    Enjoin Defendants from removing Mr. Ahmed from the United States pending these proceedings;

vii.    Order Defendants to provide Mr. Ahmed with notice and a meaningful opportunity to challenge any attempt to restrict his movement or otherwise impose conditions that change his rights as a lawful permanent resident of the United States.

viii.    Declare that Defendants' actions to arrest, detain, or transfer Mr. Ahmed violate the First Amendment, the Due Process Clause of the Fifth Amendment, the INA, the APA, the *Accardi* doctrine, and the non-delegation doctrine.

ix.    Award Plaintiff his costs for the action, including reasonable attorneys' fees; and

x.    Grant all such other and further relief as it deems just and proper.


Dated: February 12, 2026                     Respectfully submitted,
       New York, New York


                                             */s/ Roberta A. Kaplan*
                                             Roberta A. Kaplan
                                             D. Brandon Trice
                                             Maximilian T. Crema
                                             Avita Anand
                                             Zahraa N. Jazayeri*
                                             KAPLAN MARTIN LLP
                                             1133 Avenue of the Americas | Suite 1500
                                             New York, NY 10036
                                             Tel.: (212) 316-9500
                                             rkaplan@kaplanmartin.com
                                             btrice@kaplanmartin.com
                                             mcrema@kaplanmartin.com
                                             aanand@kaplanmartin.com
                                             zjazayeri@kaplanmartin.com


                                             */s/ Christopher J. Clark*

Christopher J. Clark
Andrew J. Rodgers
CLARK SMITH VILLAZOR LLP
666 Third Avenue, 21st Floor
New York, NY 10019
Tel: (212) 377-0850
clark@csvllp.com
andrew.rodgers@csvllp.com


*/s/ Norman Eisen*
NORMAN EISEN*
STEPHEN JONAS*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
norman@democracydefenders.org

* Admitted *pro hac vice*