**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IMRAN AHMED,

                    *Plaintiff,*

          v.                                             Case No. 25 Civ. 10705 (LAP)

MARCO RUBIO, *et al.*,

                    *Defendants.*


**CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS OR TRANSFER AND IN REPLY IN FURTHER SUPPORT OF
PLAINTIFF IMRAN AHMED'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

    I.    The Court Has Subject-Matter Jurisdiction ........................................................ 3

        A.    Plaintiff's challenge to his imminent arrest, detention, and transfer ............................ 4

        B.    Sections 1252(a)(5), (b)(9), and (g) do not strip the Court of jurisdiction over Plaintiff's challenge to the Policy and the Rubio Determination under the APA. ....... 13

        C.    Defendants' remaining jurisdictional arguments don't work either ............................ 15

    II.    Venue Is Proper.............................................................................................. 16

        A.    Venue Is Proper Under 28 U.S.C. § 1391(e)(1)(B) ....................................................... 17

        B.    Venue Is Also Proper Under 28 U.S.C. § 1391(e)(1)(A)............................................... 20

    III.    The Court Should Issue a Preliminary Injunction Preventing Defendants from Arresting, Detaining, or Transferring Plaintiff .......................................... 22

CONCLUSION.................................................................................................................... 25

**TABLE OF AUTHORITIES**

**CASES**

*Ajlani v. Chertoff*,
  545 F.3d 229 (2d Cir. 2008)............................................................................................ 6

*Alexander v. Sutton*,
  747 F. Supp. 3d 520 (E.D.N.Y. 2024) ......................................................................... 22

*Ali v. Barr*,
  464 F. Supp. 3d 549 (S.D.N.Y. 2020)............................................................................ 9

*Alvarez v. ICE*,
  818 F.3d 1194 (11th Cir. 2016) ..................................................................................... 6

*Am. Ass'n of Univ. Professors v. Rubio*,
  2025 WL 2777659 (D. Mass. Sept. 30, 2025) ............................................................. 13

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023)...................................................................................................... 12

*Bello-Reyes v. Gaynor*,
  985 F.3d 696 (9th Cir. 2021) ......................................................................................... 6

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986)........................................................................................................ 4

*Calderon v. Sessions*,
  330 F. Supp. 3d 944 (S.D.N.Y. 2018).......................................................................... 13

*Caremark Therapeutic Servs. v. Leavitt*,
  405 F. Supp. 2d 454 (S.D.N.Y. 2005).......................................................................... 19

*Carter v. Sewell*,
  2023 WL 7164304 (S.D.N.Y. Oct. 31, 2023) .............................................................. 21

*Chung v. Trump*,
  25 Civ. 2412 (S.D.N.Y. Mar. 25, 2025)....................................................................... 17

*Corning Inc. v. PicVue Elecs., Ltd.*,
  365 F.3d 156 (2d Cir. 2004).......................................................................................... 22

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005).......................................................................................... 15

ii

*Delgado v. Quarantillo*,
643 F.3d 52 (2d Cir. 2011)..............................................................................9, 11

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)..............................................................................................9, 13

*El-Shifa Pharm. Indus. Co. v. United States*,
607 F.3d 836 (D.C. Cir. 2010)...............................................................................14

*Farez-Espinoza v. Chertoff*,
600 F. Supp. 2d 488 (S.D.N.Y. 2009)....................................................................16

*Gulf Ins. Co. v. Glasbrenner*,
417 F.3d 353 (2d Cir. 2005)..................................................................................15

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952)..............................................................................................14

*Ho v. Greene*,
204 F.3d 1045 (10th Cir. 2000) ..............................................................................6

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)..............................................................................................19

*Humphries v. Various Fed. U.S. INS Emps.*,
164 F.3d 936 (5th Cir. 1999) ..................................................................................7

*Jafarzadeh v. Nielsen*,
321 F. Supp. 3d 19 (D.D.C. 2018) ........................................................................12

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)..............................................................................5, 7, 9, 11

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995)....................................................................................14

*Keitt v. New York City*,
882 F. Supp. 2d 412 (S.D.N.Y. 2011)....................................................................15

*Khalil v. Joyce*,
No. 25 Civ. 1963 (D.N.J. 2025)......................................................................10, 11

*Kong v. United States*,
62 F.4th 608 (1st Cir. 2023)....................................................................................6

*Kucana v. Holder*,
  558 U.S. 233 (2010) ............................................................................................ 4

*Kumar v. Holder*,
  2013 WL 6092707 (E.D.N.Y. Nov. 18, 2013) ...................................................... 6

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 21

*Lopez v. Trump*,
  2025 WL 3274224 (S.D.N.Y. July 10, 2025) ...................................................... 21

*Mahdawi v. Trump*,
  136 F.4th 443 (2d Cir. 2025) ........................................................................ *passim*

*Metro. Transp. Auth. v. Duffy*,
  784 F. Supp. 3d 624 (S.D.N.Y. 2025) .................................................................. 9

*Michalski v. Decker*,
  279 F. Supp. 3d 487 (S.D.N.Y. 2018) ............................................................ 6, 10

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025) ........................................................................................ 3

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ............................................................................................ 9

*New York Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ......................................................................... 20, 21

*New York Univ. v. Autodesk, Inc.*,
  466 F. Supp. 2d 563 (S.D.N.Y. 2006) ................................................................ 13

*Öztürk v. Garland*,
  155 F.4th 187 (2d Cir. 2025) ........................................................................ *passim*

*Öztürk v. Hyde*,
  136 F.4th 382 (2d Cir. 2025) ........................................................................ *passim*

*P.L. v. ICE*,
  2019 WL 2568648 (S.D.N.Y. June 21, 2019) .................................................... 10

*Parra v. Perryman*,
  172 F.3d 954 (7th Cir. 1999) ............................................................................... 6

*Pham v. Ragbir*,
  141 S. Ct. 227 (2020) ...................................................................................... 8

*Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*,
  838 F.2d 649 (2d Cir. 1988) .......................................................................... 14

*Prado v. Perez*,
  451 F. Supp. 3d 306 (S.D.N.Y. 2020) ........................................................... 6

*Ragbir v. Homan*,
  923 F.3d 53 (2d Cir. 2019) ............................................................................ 8

*Matter of Ramos*,
  15 I. & N. Dec. 671 (B.I.A. 1976) ............................................................... 11

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ........................................................................... 5, 7, 8, 12

*In re Rodriguez-Carrillo*,
  22 I. & N. Dec. 1031 (BIA 1999) ................................................................. 10

*Saadulloev v. Garland*,
  2024 WL 1076106 (W.D. Pa. Mar. 12, 2024) ............................................... 7

*Saget v. Trump*,
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) .......................................................... 12

*Selvarajah v. Dep't of Homeland Sec.*,
  2010 WL 4861347 (S.D.N.Y. Nov. 30, 2010) ............................................. 10

*Sierra v. United States*,
  1998 WL 599715 (S.D.N.Y. Sept. 10, 1998) ............................................... 20

*Silber v. Barbara's Bakery, Inc.*,
  950 F. Supp. 2d 432 (E.D.N.Y. 2013) .......................................................... 22

*Stafford v. Briggs*,
  444 U.S. 527 (1980) ...................................................................................... 19

*Suri v. Trump*,
  2025 WL 1806692 (4th Cir. July 1, 2025) ..................................................... 8

*Tazu v. Att'y General United States*,
  975 F.3d 292 (3d Cir. 2020) ....................................................................... 4, 7

v

*Torres-Jurado v. Biden*,
2023 WL 7130898 (S.D.N.Y. Oct. 29, 2023) .................................................................... 9

*Vargas v. U.S. Dep't of Homeland Sec.*,
2017 WL 962420 (W.D. La. Mar. 10, 2017) ..................................................................... 7

*Velesaca v. Decker*,
458 F. Supp. 3d 224 (S.D.N.Y. 2020) ............................................................................... 9

*Ventura v. Bondi*,
2026 WL 539879 (S.D.N.Y. Feb. 26, 2026) ................................................................... 21

*Widakuswara v. Lake*,
773 F. Supp. 3d 46 (S.D.N.Y. 2025) ............................................................................... 22

*You v. Nielsen*,
321 F. Supp. 3d 451 (S.D.N.Y. 2018) .............................................................................. 9

*Zadvydas v. Underdown*,
185 F.3d 279 (5th Cir. 1999) ........................................................................................... 6

*Zhislin v. Reno*,
195 F.3d 810 (6th Cir. 1999) ........................................................................................... 6

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012) ........................................................................................................ 14

*Zundel v. Gonzales*,
230 F. App'x 468 (6th Cir. 2007) ..................................................................................... 7

## STATUTES

5 U.S.C. § 701(a)(1) ......................................................................................................... 13

5 U.S.C. § 704 .................................................................................................................. 13

8 U.S.C. § 1226(a) ............................................................................................................. 4

8 U.S.C. § 1227(a)(4) .................................................................................................... 1, 10

8 U.S.C. § 1229 ............................................................................................................. 4, 12

8 U.S.C. § 1252(a)(5) ............................................................................................ 1, 8, 9, 12

8 U.S.C. § 1252(b)(4)(A) ................................................................................................. 11

8 U.S.C. § 1252(b)(9) ....................................................................................................... *passim*

8 U.S.C. § 1252(g) ........................................................................................................... *passim*

28 U.S.C. § 1391(e) ......................................................................................................... *passim*

28 U.S.C. § 1406(a) .............................................................................................................. 18

**RULES**

Fed. R. Civ. P. 65(c) ............................................................................................................ 22

**REGULATIONS**

8 C.F.R. § 287.8(c)............................................................................................................... 17

8 C.F.R. § 1003.19(h)(2)(ii)................................................................................................. 10

8 C.F.R. § 1003.35 ............................................................................................................... 12

**OTHER AUTHORITIES**

Adam J. Garnick, *Noncitizens' Access to Federal District Courts: The Narrowing of § 1252(b)(9) Post-Jennings*, 169 U. PA. L. REV. 783, 799-800 (2021) ................................... 10

Andrew Hazzard, *Operation Metro Surge: ICE numbers dwindle to under 1,000 agents in Minnesota*, SAHAN J. (Feb. 25, 2026), https://sahanjournal.com/immigration/hundreds-ice-agents-leaving-minnesota-operation-metro-surge/ ........................................................................................................................... 18

Emily Wagster Pettus*, 'A hard-working man in pursuit of the American Dream': Danish man living in Mississippi detained by ICE at naturalization meeting*, MISS. TODAY (May 20, 2025), https://mississippitoday.org/2025/05/20/ice-detained-danish-mississippi/ ............................ 18

*Immigration Court Backlog Jumps While Case Processing Slows*, TRAC IMMIGR. (June 8, 2018), https://tracreports.org/immigration/reports/516/........................................................ 10

*Immigration Court Backlog Tool*, TRAC IMMIGR. (last visited Mar. 30, 2026), https://tracreports.org/phptools/immigration/backlog/ ........................................................... 10

Memorandum from Todd M. Lyons, Senior Official Performing the Duties of the Dir., U.S. Immigr. & Customs Enf't, to All ICE Personnel, Directive 11072.4, *Civil Immigration Enforcement Actions In or Near Courthouses* (May 27, 2025)................................................ 17

Plaintiff Imran Ahmed respectfully submits this consolidated memorandum of law in further support of his motion for a preliminary injunction (ECF 10) ("Mot.") and in opposition to Defendants' motion to dismiss or transfer (ECF 49) ("Defs. Br.").[1]

## PRELIMINARY STATEMENT

More than three months ago, Secretary Rubio declared that Plaintiff's "activities" in the United States—namely, his constitutionally-protected speech criticizing policies and the practices at American tech companies—raise "potentially serious adverse foreign policy consequences." 8 U.S.C. § 1227(a)(4)(C) (the "Foreign Policy Ground"). To this day, however, DHS has not commenced removal proceedings, even though nothing prevents it from doing so. And to this day, Defendants have not even tried to defend the legality of the Secretary's determination—or of the Government's threatened arrest, detention, and transfer of Plaintiff to an ICE holding facility on the ground that his finding fault with X Corp. somehow poses "potentially" serious foreign policy consequences—a standard that until now has been invoked only in connection with foreign paramilitary leaders or those supporting terrorist or other groups who seek to harm Americans or overthrow the U.S. government.

Not surprisingly given the above, the Federal Government has sought to avoid judicial review of its actions altogether, arguing that this Court lacks the power to hear this case. But none of the INA's narrow jurisdiction-stripping provisions preclude a federal district court from providing relief to prevent an unlawful retaliatory arrest, detention, and transfer, or vacating an unlawful agency determination by the Secretary of State. Plaintiff's claims do not "aris[e] from" a decision by the Secretary of DHS to "commence proceedings," which (again) has not happened.

---

[1] Unless otherwise indicated, all defined terms have the meaning set out in the Plaintiff's opening brief. ECF 10.

8 U.S.C. § 1252(g).  Nor does Plaintiff seek review of "an order of removal," which would only be issued if and when DHS commences and completes removal proceedings.  *Id.* § 1252(a)(5), (b)(9).  Plaintiff's claims—which arise from actions that *predate* removal proceedings entirely— are "independent of, and collateral to, the removal process," whenever (and if ever) that process may occur.  *Öztürk v. Hyde*, 136 F.4th 382, 397-98 (2d Cir. 2025); *see also Mahdawi v. Trump*, 136 F.4th 443, 450 (2d Cir. 2025).  Tellingly, the Government does not even address *Mahdawi* until the end of its jurisdictional argument, in a footnote, and it never mentions *Öztürk* at all.

The Government separately argues that even if this Court has jurisdiction (which it does), venue does not lie in this District because a substantial part of the events giving rise to Plaintiff's claims did not occur here.  But Plaintiff is not just challenging Secretary Rubio's new and unprecedented interpretation of the Foreign Policy Ground, which was presumably made in Washington, D.C.  He is also challenging the consequences that would inevitably follow from that determination—his imminent arrest, detention, and transfer, which could and would occur wherever he happened to be.  In reality, the Government does not like the fact that Plaintiff came to New York to seek emergency relief to prevent those actions from occurring.  But that was a problem of Defendants' own making, given that Under Secretary Rogers decided to make her announcement on X on December 23, 2025, just one hour before the courts closed for Christmas. Faced with those exigent circumstances, it was entirely within Plaintiff's rights to travel to New York, where his long-time counsel is located and principally practices, to seek advice and take quick legal action to protect his liberty.  The fact that Plaintiff was not actually arrested, detained, and transferred in this District is simply reflective of the pre-enforcement nature of this case.  The same is true for the federal officer basis for venue: Plaintiff does not allege that Director

Almodovar took action against him because this Court, through the issuance of a temporary restraining order, prevented that from happening.

Finally, Plaintiff has not only established irreparable harm, but clearly the balance of equities and public interest favor an injunction. Unless this Court enjoins the Government, Plaintiff will be unlawfully detained and prevented from speaking until the removal process concludes—an irreparable injury that could last many months or longer.[2] And despite Defendants' remarkable claim *a la* Louis XIV's "l'état, c'est moi," that "the government's interest *is* the public interest," Defs. Br. 26, it is "emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803). And in this country, there is zero public interest in the perpetuation of unconstitutional governmental conduct. Given that the Government does not even try to reconcile its actions with the demands of our Constitution, Plaintiff easily meets his burden here.

## ARGUMENT

### I.    The Court Has Subject-Matter Jurisdiction

This Court has jurisdiction over Plaintiff's claims because they arise from his imminent retaliatory arrest, detention, and transfer, and the separate determination of Secretary Rubio, not the commencement of removal proceedings by DHS or the adjudication or execution of any removal decision. *Contra* Defs. Br. 12. As a plurality of the active judges of the Second Circuit have held, Section 1252 does not permit the Executive to arrest and detain noncitizens without judicial review. *See Öztürk v. Garland*, 155 F.4th 187, 207-08 (2d Cir. 2025) (Nathan, J., concurring in the denial of rehearing en banc, joined by Lee, Robinson, Pérez, Merriam, and

---

[2] Indeed, given the fact that no removal proceedings have been commenced, Plaintiff's unlawful detention appears to have been the point of the State Department's December 23 announcement.

Kahn, JJ.); *see also id.* at 215-16 (statement of Parker and Carney, Senior Circuit Judges, in support of the denial of rehearing en banc).[3]  And as the text of the INA makes clear and numerous courts have held, the federal courts are obviously empowered to invalidate agency decisions, even if they may relate to removal proceedings.  Were there any doubt on any of these questions, there is a strong presumption of judicial review of agency actions, which has repeatedly been applied to the INA and may be overcome only "upon a showing of clear and convincing evidence of a contrary legislative intent."  *Mahdawi*, 136 F.4th at 449 (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 671 (1986)); *see also Kucana v. Holder*, 558 U.S. 233, 251-52 (2010).

A.    **Plaintiff's challenge to his imminent arrest, detention, and transfer**

Section 1252(g).  Section 1252(g) prohibits the district courts from "hear[ing] any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General [or Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders."  The Government focuses here on the "*commence proceedings*" language.  Defs. Br. 12.  But Plaintiff does not seek to prevent DHS from actually commencing removal proceedings, which under Section 1229 ("Initiation of removal proceedings") would occur through the issuance and service of a Notice to Appear ("NTA").  *See id.* at 2 (citing same).  He seeks to instead prevent his unlawful arrest, detention, and transfer before that happens.  *See* Am. Compl., Prayer for Relief.

To stretch Section 1252(g) to cover those actions, the Government asserts that Plaintiff "seeks to challenge the government's decision to *charge* him with removability."  Defs. Br. 12

---

[3]Although *Öztürk* and *Mahdawi* are interim stay decisions, their "reasoning—[or] *ratio decidendi*—carries precedential weight in future cases." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663-64 (2025) (Gorsuch, J.) (citations and quotations omitted).  The merits panel heard argument in *Öztürk* and *Mahdawi* on September 30, 2025.  Plaintiff respectfully requests leave to submit a supplemental brief limited to the INA's jurisdiction-stripping provisions once the panel releases its decision and any *en banc* proceedings conclude.

4

(emphasis added).  But that is not true either.  Section 1229 does not even mention the words "arrest," "detention," or "transfer," and Section 1226(a) is clear that a person "*may* be arrested and detained pending a decision" on removal, contrary to the notion that such actions are inherent in the commencement of proceedings.  8 U.S.C. § 1226(a) (emphasis added).  Indeed, in *Öztürk*, the Government conceded that Section 1226(a) does not mandate arrest and detention.  136 F.4th at 398 ("In other words, [petitioner's] detention was not *mandated* by the mere fact that her case was under adjudication.") (emphasis in original).

The Government is left to argue that although Section 1252(g) admittedly "does not sweep broadly," Defs. Br. 13 (quoting *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 296 (3d Cir. 2020)), it must cover arrest, detention, and transfer because the "commencement" of removal proceedings necessarily encompasses the "*method* by which the Secretary of Homeland Security chooses to commence removal proceedings."  *Id*. at 14 (emphasis on original).  But again, the INA *statutory text* is clear: the method by which the Secretary "commences" proceedings is the issuance and service of an NTA.  8 U.S.C. § 1229(a).  What's more, the Government's expansive reading not only flies in the face of Section 1252(g)'s plain language—which is specifically directed to an action to "commence proceedings"—but also the Supreme Court's recognition that Section 1252(g) is "narrow" and only bars claims challenging the three "discrete actions" of "prosecutorial discretion" listed therein: "the decision or action … to *commence* proceedings, *adjudicate* cases, or *execute* removal orders."  *Öztürk*, 136 F.4th at 396-97 (quoting *Reno v. American-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482, 489 (1999)) (emphases in original).  Indeed, the Supreme Court has been very clear that Section 1252(g) *does not* extend beyond those specific actions  to the "'many other decisions or actions that may be part of the deportation process' but that do not fall within the three discrete exercises of 'prosecutorial

5

discretion' covered by § 1252(g)," "such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order." *AADC*, 525 U.S. at 482; *see also Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (Alito, J.) (plurality opinion) (Section 1252(g) "refer[s] to just those three specific actions themselves"). To state the obvious, the courts do not and this Court is not being asked to interfere with DHS's discretion over *whether or not to prosecute* by preventing arrest, detention, or transfer, none of which are required to commence prosecution. *See AADC*, 525 U.S. at 483-84 (recognizing that Section 1252(g) was passed in response to challenges to prosecutorial refusals to defer removal action, and thus targeted these three actions "which represent the initiation or prosecution of various stages in the deportation process").[4]

Were there any doubt, in both *Öztürk* and *Mahdawi*, the Second Circuit rejected the Government's argument that detention is synonymous with the commencement of proceedings and held that Section 1252(g) "does not preclude jurisdiction over the challenges to the legality of [a noncitizen's] detention." *Öztürk*, 136 F.4th at 397 (quoting *Kong v. United States*, 62 F.4th 608, 609 (1st Cir. 2023)). As the Second Circuit explained, claims of unlawful and retaliatory detention "are independent of, and collateral to, the removal process" and "do not arise from the three discrete exercises of prosecutorial discretion that are shielded by § 1252(g)." *Id.* at 398; *Mahdawi*, 136 F.4th at 450-51. When it comes to the commencement of removal proceedings, the filing of "a Notice to Appear…in an immigration court is the action that" is actually and specifically

---

[4] Indeed, the other actions listed in *AADC*, such as investigating and surveilling, are arguably integral in many cases to the ultimate decision to exercise prosecutorial discretion. Yet that did not stop the Supreme Court from recognizing that those actions do not arise from the commencement of proceedings. *See AADC*, 525 U.S. at 485-86.

6

covered.  *Öztürk*, 136 F.4th at 397-98; *see also Öztürk*, 155 F.4th at 208 (Nathan, J., concurring) ("The government's elephant simply does not fit in this mousehole.").

Every other appellate court to consider the question has reached the same conclusion.  *See Kong*, 62 F.4th at 609; *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 n.4 (9th Cir. 2021) (Section 1252(g) did not strip court of jurisdiction over noncitizen's claim alleging unlawful arrest and detention in violation of the First Amendment); *Ho v. Greene*, 204 F.3d 1045, 1051-52 (10th Cir. 2000) (challenge to detention does not implicate Section 1252(g)); *Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999) (Section 1252(g) "does not foreclose review" of claims concerning "detention while the administrative process lasts"); *Zadvydas v. Underdown*, 185 F.3d 279, 285-86 (5th Cir. 1999) ("[D]etention, while intimately related to efforts to deport, is not itself a decision to 'execute removal orders' and thus does not implicate section 1252(g)"); *Zhislin v. Reno*, 195 F.3d 810, 814 (6th Cir. 1999) (Section 1252(g) does not bar claims challenging noncitizen's detention).[5]

Rather than engage with any of this authority, Defendants rely on the Eleventh Circuit's decision in *Alvarez v. ICE*, 818 F.3d 1194 (11th Cir. 2016). Defs. Br. 14.  That case, however, involved the lodging of a detainer, which the Court effectively equated with the commencement of proceedings, as an alternative to ICE "agreeing to a stipulated order" per a plea agreement "to reach a definitive understanding of [Alvarez's] immigration status and the effect of [the] case on

---

[5] *See also Prado v. Perez*, 451 F. Supp. 3d 306, 312 (S.D.N.Y. 2020) (collecting cases); *Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018).  Defendants' in-circuit cases are inapposite because they concern challenges brought against removal proceedings.  *Ajlani v. Chertoff*, 545 F.3d 229, 235 (2d Cir. 2008) (plaintiff sought order declaring "then-pending removal proceedings against him … unconstitutional"); *Kumar v. Holder*, 2013 WL 6092707, at *6 (E.D.N.Y. Nov. 18, 2013) (plaintiff asked the district court to invalidate ongoing removal proceedings).

his immigration status." *Alvarez*, 818 F.3d at 1196-98, 1202-03.  In other words, in that case, continued detention *was* actually the commencement of proceedings given the stipulated order.[6]

Defendants' reliance on *AADC* is similarly misplaced.  Defs. Br. 15-16.  There, the United States Supreme Court held that Section 1252(g) stripped the district court of jurisdiction over selective prosecution claims where the noncitizen plaintiffs challenged the decision not to defer action and to instead execute final orders of removal.  *AADC*, 525 U.S. at 474-82.  But Plaintiff is not asserting a selective prosecution claim, nor is he challenging any decision "about whether and when to commence removal proceedings."  Defs. Br. 13.  Indeed, the "claims in [*AADC*] did not sound in unlawful detention at all, and *AADC* is therefore of no help to the government."  *Mahdawi*, 136 F.4th at 451 (emphasis in original); *accord Jennings*, 583 U.S. at 294 (*AADC* did not interpret "arising from" in Section 1252(g) "to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General.  Instead, we read the language to refer to just those three specific actions themselves.").[7]

---

[6] The Government's other two cases are not persuasive.  Defs. Br. 14.  In *Saadulloev v. Garland*, the Pennsylvania district court held that "arrest" was "commencement" because it "flowed directly" from that decision.  2024 WL 1076106, at *3 (W.D. Pa. Mar. 12, 2024).  In *Tazu v. Attorney General of the United States*, the Third Circuit stated, in a single sentence, that the Attorney General's decision to *re-detain* the plaintiff fell within Section 1252(g) (and (b)(9)) because "[w]hile this claim does not challenge the Attorney General's *decision* to execute his removal order, it does attack the *action* taken to execute that order."  975 F.3d 292, 298 (3d Cir. 2020) (emphasis in original).  But that does not speak to the question at issue here— commencement.  And anyway, that is not how the Supreme Court has "narrow[ly] construed" Section 1252(g), which focuses on whether "claims" arise from three discrete actions (including commencement), *AADC*, 525 U.S. at 487, and it is not how the Second Circuit has construed Section 1252(g), either.

[7] Defendants' remaining authorities are equally inapposite.  *Zundel v. Gonzales*, 230 F. App'x 468, 475 (6th Cir. 2007) (challenge to order of removal); *Vargas v. U.S. Dep't of Homeland Sec.*, 2017 WL 962420, at *3 (W.D. La. Mar. 10, 2017) (challenge to being placed in removal proceedings). In fact, the court in *Humphries v. Various Federal U.S. INS Employees* held that § 1252(g) did not deprive it of jurisdiction over claims alleging mistreatment in immigration detention.  164 F.3d 936, 945 (5th Cir. 1999).

Finally, even if Section 1252(g) applied (and it does not), Defendants' conduct here falls within the exception recognized by the Supreme Court in *AADC* for "outrageous" constitutional violations. 525 U.S. at 491; *accord Ragbir v. Homan*, 923 F.3d 53, 69 (2d Cir. 2019), *vacated on other grounds*, 141 S. Ct. 227 (2020). As in *Ragbir*, the Government has explicitly stated that the action it has taken against Plaintiff is "based on [its] disfavor of [his] speech (and its prominence)," its threatened actions "would broadly chill protected speech" by Plaintiff and others, and the removal of Plaintiff, a lawful permanent resident, is obviously "punitive." *Id.* at 71-73; ECF 42 at 7.

Sections 1252(a)(5) and (b)(9). Section 1252(a)(5) and (b)(9) do not apply because Plaintiff does not seek review of a removal order. By their text, Section 1252(a)(5) only bars district court review of an "order of removal," and § 1252(b) only applies "[w]ith respect to review of an order of removal." 8 U.S.C. §§ 1252(a)(5), (b). No such order exists here. That ends the analysis. The Second Circuit has held that Section 1252(a)(5) and (b)(9) are limited "to review of an order of removal" and have no application where "[n]o such order of removal is at issue." *Öztürk*, 136 F.4th at 399, 401; *see also Öztürk*, 155 F.4th at 209 (Nathan, J., concurring) ("Since there are no orders of removal for these petitioners, § 1252(b)(9) does not apply."); *see also Suri v. Trump*, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025) ("On their face, these provisions apply only to challenges to an order of removal. There is no such order here, so these provisions don't apply.").

The Government argues that Plaintiff's claims are somehow swept into these provisions because they "arise from" the removal process. But that is not the law of this Circuit. To the contrary, Sections 1252(a)(5) and (b)(9) "do[] not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process

9

by which removability will be determined."  *Mahdawi*, 136 F.4th at 452 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020)).  As *Öztürk* explained, "the mere fact that a noncitizen is detained [in a removal proceeding] does not deprive district courts of jurisdiction."  136 F.4th at 399.  Any contrary rule would create an "'absurd' result" since it would make unlawful detention claims "'effectively unreviewable' because, '[b]y the time a final order of removal [is] eventually entered, the allegedly excessive detention would have already taken place."  *Id.* at 401 (quoting *Jennings*, 583 U.S. at 293).[8]

Defendants do not engage with this controlling authority that expressly rejects the "inextricably intertwined" theory that they are attempting to use here.  Defs. Br. 19, 21 n.4.[9]  As the Second Circuit has explained, what matters is the "substance of the relief" sought.  *Öztürk*, 155 F.4th at 210 (Nathan, J., concurring) (quoting *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011)).  Here, Plaintiff seeks immediate injunctive relief from unconstitutional detention—relief that is "independent of the removal process" and which a court of appeals reviewing a final removal order cannot meaningfully provide.  *Öztürk*, 136 F.4th at 399 (quoting *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 810 (9th Cir. 2020)).[10]

---

[8] Even before *Öztürk* and *Mahdawi* were decided, courts in this District had reached the same conclusion.  *See, e.g.*, *You v. Nielsen*, 321 F. Supp. 3d 451, 459 (S.D.N.Y. 2018) ("[I]nterpreting §§ 1252(a)(5) and (b)(9) to bar Petitioner's claims challenging his arrest and detention unless those claims were crammed into a petition for review of a removal order would render such claims effectively unreviewable."); *Torres-Jurado v. Biden*, 2023 WL 7130898, at *3 (S.D.N.Y. Oct. 29, 2023) (*Jennings* forecloses a "reading of § 1252(b)(9)" that "would permit ICE to arrest [and] detain" plaintiff "without any statutory or constitutional constraints").

[9] While Defendants seek to distinguish *Mahdawi* because Plaintiff "is not detained," Defs. Br. 21 n.4, they ignore that Plaintiff faces imminent threat of arrest and detention, which itself chills his speech and imposes irreparable harm.  *Velesaca v. Decker*, 458 F. Supp. 3d 224, 240-41 (S.D.N.Y. 2020); *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 580 (1976).  "Damocles's sword does not have to actually fall before the court will issue an injunction."  *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 692 (S.D.N.Y. 2025) (cleaned up).

[10] None of the cases Defendants cite, Defs. Br. 20,  held that arrest and detention "arise from" the removal process.  *See Ali v. Barr*, 464 F. Supp. 3d 549, 557-58 (S.D.N.Y. 2020) (challenge to

That injunctive relief was and is urgently needed in this case, and it cannot be obtained through the administrative process. Defendants have taken the position that individuals subject to the Foreign Policy Ground are barred by 8 C.F.R. § 1003.19(h)(2) from seeking release on bond from an immigration judge. Government's Response to Court's Order, *Khalil v. Joyce*, No. 25 Civ. 1963 (D.N.J. 2025), ECF 190 at 1 (asserting that "[t]he IJ [c]annot [o]rder [r]elease" where someone is charged under § 1227(a)(4)). Even if the Foreign Policy Ground were not at issue, neither an immigration judge nor the Board of Immigration Appeals can consider Plaintiff's unconstitutional detention claims. *In re Rodriguez-Carrillo*, 22 I. & N. Dec. 1031, 1035 (BIA 1999) ("[N]either the Immigration Judge nor this Board may rule on the constitutionality of the statutes that we administer."); *accord Michalski v. Decker*, 279 F. Supp. 3d 487, 496 (S.D.N.Y. 2018).

Simply put, Defendants' position would require Plaintiff to remain in detention for months or years before obtaining review of the constitutionality of the Government's actions.[11] By the time Plaintiff is issued any removal order and the BIA affirms the order, a court of appeals could

---

"enforcement of filing deadlines in [noncitizen plaintiff's] immigration proceedings"); *P.L. v. ICE*, 2019 WL 2568648, at *1-3 (S.D.N.Y. June 21, 2019) (challenge to use of video teleconferencing); *Selvarajah v. Dep't of Homeland Sec.*, 2010 WL 4861347, at *4 (S.D.N.Y. Nov. 30, 2010) (challenge to validity of NTA).

[11] The average wait time nationally for any hearing before an immigration judge is nearly 900 days, or almost two and a half years. *See Immigration Court Backlog Tool*, TRAC IMMIGR. (last visited April 10, 2026), https://tracreports.org/phptools/immigration/backlog/. Although wait times may be shorter for noncitizens in detention, the wait is still months long. *Immigration Court Backlog Jumps While Case Processing Slows*, TRAC IMMIGR. (June 8, 2018), https://tracreports.org/immigration/reports/516/. And if an immigration judge sustains the government's charges, it would likely be several months, or even years, before Plaintiff can administratively exhaust his claims and bring them through a petition for review in a court of appeals. *See* Adam J. Garnick, *Noncitizens' Access to Federal District Courts: The Narrowing of § 1252(b)(9) Post-Jennings*, 169 U. PA. L. REV. 783, 799-800 (2021).

11

not provide a meaningful remedy for the irreparable harm he would have suffered. And the law of this Circuit does not require such an unjust and illogical outcome. *Öztürk*, 136 F.4th at 399.

The Third Circuit's decision in *Khalil* is of no help to Defendants because that decision expressly departed from Second Circuit caselaw. *Khalil v. President, United States*, 164 F.4th 259, 279 (3d Cir. 2026). In fact, *Khalil* did not just reach a different result from *Öztürk* and *Mahdawi*—its reasoning is fundamentally inconsistent with the reasoning in those Second Circuit decisions because courts in this Circuit look to "the substance of the relief that a plaintiff is seeking." *Öztürk*, 136 F.4th at 400 (quoting *Delgado*, 643 F.3d at 55). In this Circuit, it is immaterial whether there is "substantial substantive overlap" between the plaintiff's detention claim and defenses to removal, *id.*; *contra* Defs. Br. 19, even if that overlap is fatal in the Third Circuit. *Khalil*, 164 F.4th at 274-276. In any event, *Khalil* is distinguishable because in that case, there was an order of removal. *Id.* at 276; *compare Öztürk*, 136 F.4th at 399 (Section 1252(b)(9) requires order of removal).[12]

But even under the framework in *Khalil*, Section 1252(b)(9) does not require that Plaintiff wait to raise his constitutional claims until the end of the removal process, pursuant to a petition for review to a court of appeals. When Plaintiff's case eventually reaches that court (if it does at all), the court will be constrained to "decide the petition only on the administrative record on which the removal order is based." 8 U.S.C. § 1252(b)(4)(A). An immigration judge ("IJ") is not authorized to develop a factual record into the retaliatory purpose or reasonableness of Plaintiff's

---

[12] It is misleading for Defendants to claim *Jennings* held that "§ 1252(b)(9) includes challenges to [a] 'decision to detain [a noncitizen] in the first place." Defs. Br. 19. For one thing, this portion of *Jennings* was joined by only three Supreme Court justices (a fact that Defendants fail to acknowledge). For another, those justices merely "note[d]" that the jurisdictional question before the Court might have been more difficult if petitioners were challenging … the decision to detain them in the first place." *Jennings*, 583 U.S. at 294. Later Supreme Court caselaw has read this dicta out of *Jennings*. *See Öztürk*, 155 F.4th at 209 (Nathan, J., concurring).

12

detention.[13]  The BIA has long held that IJs cannot address as-applied constitutional claims.  *See Matter of Ramos*, 15 I. & N. Dec. 671, 675 (B.I.A. 1976) (declining to consider as-applied equal protection and due process claims because IJs "do not entertain constitutional challenges").  IJs are limited by statute and regulation to developing evidence that is "essential" to the adjudication of removability.  8 C.F.R. § 1003.35 (depositions and subpoenas only available if "evidence is essential"); 8 U.S.C. § 1229a(b)(1) (providing IJs limited authority to "receive evidence"); *see Saget v. Trump*, 345 F. Supp. 3d 287, 296 (E.D.N.Y. 2018) ("Plaintiffs would not be able to assert the claims they pursue here in immigration court" because claims based on allegations of "unconstitutional racial animus" "would require developing a record that would not be relevant to an individual removal proceeding").  More fundamentally, as Judge Nathan has explained, *Öztürk*, 155 F.4th at 210 (Nathan, J., concurring), even if Plaintiff could obtain some relief through a Petition for Review ("PFR") process, it would be "too late to be meaningful."  *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023).  So, under the logic of Defendants' argument, as a practical matter, Plaintiff would have no way of challenging the constitutionality of Defendants' decision to deport him based on his protected speech.

**B.    Sections 1252(a)(5), (b)(9), and (g) do not strip the Court of jurisdiction over Plaintiff's challenge to the Policy and the Rubio Determination under the APA**

Beyond their general denial, Defendants do not explain why this Court lacks jurisdiction over Plaintiff's challenges to the Rubio Determination re-interpreting the Foreign Policy Ground and Defendants' policy of targeting noncitizens for removal based on First Amendment protected

---

[13]The independent judgment of IJs is also now under threat as President Trump has been "systematically pressured the nation's immigration judges, threatening them with disciplinary action if they do not deport more people and firing those seen as insufficiently supportive of the president's aggressive enforcement agenda." Nicholas Nehamas, *et al.*, *How Trump Purged Immigration Judges to Speed Up Deportations*, N.Y. Times (Apr. 9, 2026) https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html.

13

speech (the "Policy"). That radio silence makes sense. By its express terms, Section 1252(g) is inapplicable because the Rubio Determination is not a "decision or action by the Attorney General." 8 U.S.C. § 1252(g). Indeed, the courts have repeatedly recognized that straightforward challenges to administrative actions are entirely separate from—and upstream of—any immigration removal proceeding, and thus fall well outside the INA's jurisdiction-stripping provisions. Am. Compl. ¶¶ 116-18 (Policy); *id.* ¶¶ 95-122 (Rubio Determination); *see also id.*, Prayer for Relief (ii)-(iii); *see, e.g.*, *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 29 (D.D.C. 2018) (Section 1252(g) does not apply to "agency actions [that are] separate from—and, indeed, predate—any decision or action to commence or adjudicate [plaintiff's] removal proceeding").

In many ways, this case presents a textbook version of a classic APA claim. After all, for most if not all of our nation's history, the Foreign Policy Ground (and its predecessors) has been invoked only in situations where the individual to be deported allegedly provided support for or allegiances to groups hostile to the United States like anarchists, communists, or terrorist groups. *See AADC*, 525 U.S. at 473; *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 136-73 (D. Mass. Sept. 30, 2025); JULIA ROSE KRAUT, THREAT OF DISSENT 2-3 (Harvard Univ. Press, 2023) (tracing the history of United States' "very long history of such ideological exclusions and deportations"). Now, for the first time ever in our nation's history, the Secretary of State has interpreted the statutory language to also apply to people who merely criticize the operations of American corporations.

The Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), is instructive. There, the Government argued that Sections 1252(b)(9) and (g) barred judicial review of the Trump Administration's rescission of DACA, because the rescission was "an initial 'action' in DHS's 'commence[ment] of

14

proceedings'"—namely, the removal proceedings that would inevitably flow from the elimination of deferred action.  Brief for the Petitioners at 21, *Regents*, 591 U.S. 1 (Aug. 19, 2019).  Yet the Court easily rejected that argument, explaining that the jurisdictional provisions do not apply "where, as here, the parties are not challenging any removal proceedings."  *Regents*, 591 U.S. at 19.  The same is true here.

### C.    Defendants' remaining jurisdictional arguments don't work either

Defendants' remaining arguments lack merit for similar reasons.  First, because Section 1252 does not bar this Court's review of Plaintiff's claims, *see supra* at 3-14, the jurisdictional limitation in 5 U.S.C. § 701(a)(1) is not triggered.  *See, e.g.*, *Calderon v. Sessions*, 330 F. Supp. 3d 944, 958 (S.D.N.Y. 2018) (reaching APA claims after finding Section 1252 did not strip the court of jurisdiction); *see also New York Univ. v. Autodesk, Inc.*, 466 F. Supp. 2d 563, 564-65 (S.D.N.Y. 2006) (the APA "confers a general cause of action upon persons adversely affected or aggrieved by agency action" and § 701(a)(1) only withdraws that cause of action if a relevant statute "preclude[s] judicial review") (internal quotations omitted).  Likewise, a PFR is not an "adequate remedy."  5 U.S.C. § 704; *see supra* at 13.

Second, the political question doctrine does not apply.  As Defendants' own cases recognize, "the political question doctrine does not bar a claim that the government has violated the Constitution simply because the claim implicates foreign relations."  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010); *Harisiades v. Shaughnessy*, 342 U.S. 580, 591 (1952) (reviewing removal of immigrants for constitutional violations); *see also Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) ("Not every case 'touching foreign relations' is nonjusticiable, and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights.") (internal citations omitted).

Plaintiff does not ask the Court to evaluate or second guess the foreign policy of the United States, *contra* Defs. Br. 24; he asks the Court to decide if Defendants' interpretation of a statute is correct and if their actions are constitutional—all of which is "a familiar judicial exercise." *Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012); *accord Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 838 F.2d 649, 655-56 (2d Cir. 1988) (noting "there is no lack of judicially discoverable or manageable standards" when applying "First Amendment jurisprudence").

## II.    Venue Is Proper

Defendants' venue argument ignores the facts that gave rise to this lawsuit. This was no ordinary challenge to threatened governmental action that could be filed and litigated in the normal course. Instead, without warning (and no doubt on purpose),[14] Defendants announced they had "SANCTIONED" Plaintiff just one hour before the courts closed for the Christmas holiday, placing him at immediate risk of arrest, detention, and transfer to Louisiana, as has happened in other high-profile cases, with the very real prospect that he would not be able to seek judicial recourse in time. Faced with that imminent threat, Plaintiff rushed to court and moved for a TRO in the Southern District of New York—the district in which he was located at that time.

Defendants suggest that venue turns solely on where officials in Washington made the underlying determination. Defs. Br. 7. It does not.[15] Venue turns on the facts giving rise to the claims as they existed when Plaintiff filed suit. *See Keitt v. New York City*, 882 F. Supp. 2d 412, 459 n.44 (S.D.N.Y. 2011). Here, Defendants' actions created an immediate and concrete risk to

---

[14] The administrative record establishes Defendant Rubio invoked the Foreign Policy Ground against Plaintiff on December 19. ECF 42 at 8. Defendants waited four days, until shortly before Christmas, to announce that decision.

[15] If it did, then Judge Liman did not have proper venue to decide the MTA's challenge to the Secretary of Transportation's decision to withdraw approval for congestion pricing in Manhattan. But the Government didn't even try to make such an argument there. *Metro. Transp. Auth. v. Duffy*, 2026 WL 588117 (S.D.N.Y. Mar. 3, 2026).

Plaintiff's liberty in New York City, forcing him to seek judicial intervention without delay.  In those circumstances, the Southern District was not merely an available forum; it was the forum Defendants' own conduct made necessary.  As explained below, Plaintiff has established two independent grounds for venue here.

### A.    Venue Is Proper Under 28 U.S.C. § 1391(e)(1)(B)

First, venue is proper because "a substantial part of the events or omissions giving rise to the claim occurred" in this District.  28 U.S.C. § 1391(e)(1)(B).  In applying this standard, courts identify the claims and the acts or omissions that allegedly gave rise to the claims, then determine whether "significant events or omissions material to [those] claim[s]" occurred here.  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) (quoting *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005)).  The question is not which district hosted the "most substantial" events, but whether the events in the forum bear a nexus to the wrong.  *Id.* at 433.  They do here.  Plaintiff challenges both the Government's designation of him *and* the enforcement machinery Defendants set in motion against him on the night before Christmas Eve.  The threatened arrest, detention, and transfer in this District form an essential part of the events giving rise to those claims.

The Amended Complaint alleges exactly that.  Plaintiff alleges that he often travels to New York City for work, was physically present in New York City when he filed suit, that the New York ICE Field Office would detain him here, and that "[a] substantial part of the events giving rise to [his] claims occurred in this district, including the imminent threat of detention by the New York ICE Field Office."  Am. Compl. ¶¶ 8, 16-17.  He also seeks an order enjoining arrest, detention, and transfer from this District.  Those allegations establish a direct nexus between this forum and the threatened enforcement consequences of Defendants' actions.  *Farez-Espinoza v. Chertoff*, 600

17

F. Supp. 2d 488 (S.D.N.Y. 2009), confirms the point.  There, the court held that venue was proper where "[t]he key events and circumstances leading to [the petitioner's] detention" occurred in this District, even though officials later transferred him elsewhere.  *Id*. at 496.  So too here.  At the time of filing, Defendants' actions had already exposed Plaintiff, while he was in New York, to immediate enforcement consequences in this District.

While Defendants call that threat "speculative," Defs. Br. 9, that is a bold statement for the Government to make at this time.  Recent cases show a concrete and recurring pattern: once the government targets a high-profile figure like Plaintiff under the Foreign Policy Ground, ICE will arrest that person wherever they encounter him, with little or no warning, and move the person across jurisdictions before counsel can intervene.  In *Mahdawi*, ICE arrested the plaintiff not at home in New York, but at a routine naturalization interview in Vermont, and then immediately took him to an airport to transport him to Louisiana.  136 F.4th at 446-48.  In *Öztürk*, officers arrested the plaintiff without warning on a public street, moved her across state lines, and prevented counsel from tracking her location in real time while she remained in transit.  136 F.4th at 388-93.  And in *Chung v. Trump*, ICE agents did not limit their efforts to plaintiff's residence in New York; they also went to her parents' home "outside of this District," underscoring that the risk of arrest does not remain fixed to a person's home address or state of domicile.  Petitioner's Br., 25 Civ. 2412 (S.D.N.Y. Mar. 25, 2025), ECF 17 at ¶ 48.

The Joyce Declaration ("Declaration") does not defeat venue either.[16]  The Declaration says only that ERO New York has no "planned enforcement action against Mr. Ahmed."  Joyce

---

[16] Throughout these proceedings, the government has maintained that no discovery beyond the heavily redacted administrative record is warranted.  ECF 33 at 2; ECF 45 at 1.  Yet it now submits additional factual material—outside that record—through a sworn declaration to bolster its litigation position.  That selective use of factual information outside of the administrative record further confirms that the administrative record is incomplete and that discovery is needed.  ECF 44.

Decl. ¶¶ 6-7. But that is hardly surprising: Plaintiff succeeded in promptly convincing the Court to enjoin Defendants from arresting or detaining Plaintiff. ECF 14. The Declaration does not speak to ERO New York's intentions if the TRO were to be lifted, does not disclaim New York ICE's authority to arrest or detain Plaintiff if agents encountered him here, and the Joyce Declaration does not deny the very risk that forced him to seek immediate relief in this District in the first place. Nor could it. ICE's own guidance authorizes officers to conduct civil immigration enforcement whenever they have "credible information" that a targeted noncitizen "is or will be present at a specific location," and it permits case-by-case enforcement against other persons encountered during the operation—regardless of their state of residence.[17] *See* 8 C.F.R. § 287.8(c) (authorizing immigration officers to arrest noncitizens without reference to state of residence).

Recent practice bears that out. For example, a Mississippi resident traveled to Memphis for a naturalization interview; ICE detained him there, and he later surfaced in detention in Louisiana.[18] Any suggestion that ICE confines its enforcement capacity to a field office's formal "area of responsibility" is, at best, insincere. Joyce Decl. ¶ 7. In Minnesota, for example, federal court filings showed that more than 4,000 federal agents participated in Operation Metro Surge at its peak, even though the St. Paul Field Office typically employs about 190 agents.[19]

---

[17] Memorandum from Todd M. Lyons, Senior Official Performing the Duties of the Dir., U.S. Immigr. & Customs Enf't, to All ICE Personnel, Directive 11072.4, *Civil Immigration Enforcement Actions In or Near Courthouses* (May 27, 2025), https://www.ice.gov/doclib/foia/policy/11072.4.pdf.

[18] Emily Wagster Pettus*, 'A hard-working man in pursuit of the American Dream': Danish man living in Mississippi detained by ICE at naturalization meeting*, MISS. TODAY (May 20, 2025), https://mississippitoday.org/2025/05/20/ice-detained-danish-mississippi/.

[19] Andrew Hazzard, *Operation Metro Surge: ICE numbers dwindle to under 1,000 agents in Minnesota*, SAHAN J. (Feb. 25, 2026), https://sahanjournal.com/immigration/hundreds-ice-agents-leaving-minnesota-operation-metro-surge/.

Defendants' suggestion that Plaintiff faced only a speculative risk in New York cannot be squared with the Government's own recent enforcement practices. The cases and examples above show that once the Government targets an individual like Plaintiff for enforcement, arrest may occur wherever that person is found, and rapid out-of-district transfer may follow before counsel can meaningfully intervene. Plaintiff did not need to sit still and wait for that sequence to begin in his own case. Venue turns on the facts that existed when Plaintiff filed suit. And at that moment, Defendants had just publicly targeted Plaintiff shortly before the courts closed for Christmas, he was in New York working with his longtime counsel because of that action, and Plaintiff sought to prevent his arrest, detention, and transfer from this District before the Government could act first. That is more than enough to make venue proper here under Section 1391(e)(1)(B).[20]

**B.        Venue Is Also Proper Under 28 U.S.C. § 1391(e)(1)(A)**

Venue is also independently proper in this District because a civil action against a federal officer or agency "may be brought" in any judicial district in which "a defendant in the action resides." 28 U.S.C. § 1391(e)(1)(A). The Amended Complaint names Judith Almodovar in her official capacity as Acting Field Office Director of the New York ICE Field Office and identifies her official address as 26 Federal Plaza, New York, New York 10278. Am. Compl. ¶ 14. That is sufficient. *See Caremark Therapeutic Servs. v. Leavitt*, 405 F. Supp. 2d 454, 459 (S.D.N.Y. 2005) ("[V]enue with respect to a federal officer or employee is proper in the place of his or her official residence, where his or her official duties are performed.").

---

[20] If the Court concludes that venue is improper, transfer—and not dismissal—would be the appropriate remedy "in the interest of justice." 28 U.S.C. § 1406(a); *Gibbons v. Fronton*, 661 F. Supp. 2d 429, 437 (S.D.N.Y. 2009). Plaintiff also respectfully requests that the Court extend the TRO for a period of 14 days to preserve the *status quo* following any such transfer.

Defendants argue that Almodovar's residence is immaterial because the "Amended Complaint does not include any 'actions' taken by Director Almodovar." Defs. Br. 10. But this is a pre-enforcement challenge: the whole point was to obtain an injunction *before* ICE arrested Plaintiff. The Amended Complaint alleges that Director Almodovar heads the New York ICE Field Office, that Plaintiff was physically present in New York, that the New York ICE Field Office would detain him here, and that he sought relief aimed directly at preventing arrest, detention, and transfer. Am. Compl. ¶¶ 8, 14, 16. There is nothing "speculat[ive]" about the fact that "because Plaintiff happened to be in New York City, [ ] ICE might detain him here," especially since Plaintiff frequently travels to Manhattan to attend meetings for his job, and has been here 9 separate times over the past three months since December 23, 2025 (or for 25 days out of 108 days, of which an additional 25 were spent on paternity leave and not working due to the birth of his second daughter). Ahmed Decl. ¶¶ 3-12; Defs. Br. 10.

More to the point, Defendants' venue argument depends on an exception to § 1391(e)(1)(A) that the text does not provide. The statute does not ask whether the resident official is the "most responsible" defendant—only whether "a defendant in the action resides" in the district. 28 U.S.C. § 1391(e)(1)(A). Here the answer is "yes." And because the text of § 1391(e)(1)(A) "provides a clear answer," that is the end of the analysis. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *see also Stafford v. Briggs*, 444 U.S. 527, 540 (1980) (§ 1391(e) was "designed to permit an action which is essentially against the United States to be brought locally rather than requiring that it be brought in the District of Columbia simply because Washington is the official residence of the officer or agency sued") (emphasis and citations omitted).[21]

---

[21] While Defendants cite to *Sierra v. United States*, 1998 WL 599715, at *4-6 (S.D.N.Y. Sept. 10, 1998), that decision concerned a motion to dismiss and did not consider Section 1391(e) at all. Defendants do not argue the Amended Complaint fails to allege sufficient facts to state a claim.

21

### III.    The Court Should Issue a Preliminary Injunction Preventing Defendants from Arresting, Detaining, or Transferring Plaintiff

Unless the Court extends the TRO by granting Plaintiff's motion for a preliminary injunction, Plaintiff will be arrested, detained, and—in all likelihood—transferred to an ICE holding facility far away from his wife, daughters (one of whom is a newborn), and support network.  Defendants do not meaningfully dispute that the traditional factors governing equitable relief all weigh in Plaintiff's favor.  *See* ECF 10 at 17-21; *see also Mahdawi*, 136 F.4th at 449-55 (holding that likelihood of success, irreparable injury, and balance of the equities all favored denying stay of district court bail order).

***Likelihood of Success on the Merits.***  As discussed above, Defendants' brief is silent on the merits.  Defs. Br. 24-25.  Even they do not claim that the First Amendment authorizes the retaliatory detention of a lawful permanent resident, nor do they attempt to square their conduct with the Due Process Clause, the APA, or the *Accardi* doctrine.  Similarly, they provide no justification for how or why the Foreign Policy Ground (which has traditionally been reserved for people allegedly providing support for terrorist or otherwise violent groups that threaten the United States) should now be used to deport a green card holder simply because he has criticized the policies and practices of American technology companies like Elon Musk's X.[22]  Accordingly,

---

[22] To the extent Defendants' position is that speech creates "serious foreign policy consequences" whenever it puts the United States at odds with other governments, X Corp. and other tech companies would be more obvious candidates than Plaintiff.  The State of Florida recently announced an investigation into OpenAI, whose technology may fall "into the hands of America's enemies, such as the Chinese Communist Party."  Reuters Business, *Florida AG Opens Probe into Open AI Ahead of Potential IPO*, REUTERS (Apr. 9, 2026) https://www.reuters.com/business/florida-ag-probe-openai-chatgpt-2026-04-09/.  X Corp. has repeatedly embroiled itself in high-profile disputes with foreign governments, including Australia and Brazil, over compliance with those countries' laws, court orders, and online-safety regimes.  *See, e.g.*, *Statement on Removal of Extreme Violent Content*, Australia eSafety Comm'r (Apr. 23, 2024) (stating that X Corp. failed to comply with Australia's removal notice concerning extreme violent content), https://www.esafety.gov.au/newsroom/media-releases/statement-on-removal-of-extreme-violent-content; Nandana Arun, *Brazil Supreme Federal Court Justice Fines*

22

this factor weighs heavily in favor of an injunction. *See New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("Consideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor.").

   ***Irreparable Harm.*** Because Plaintiff is likely to succeed in establishing his constitutional claims, irreparable harm is presumed. *See id.,* at 486 ("As a matter of law, the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury"); *Ventura v. Bondi*, 2026 WL 539879, at *4 (S.D.N.Y. Feb. 26, 2026) (finding irreparable harm because "[f]reedom from imprisonment—government custody, detention, or other forms of physical restraint—lies at the heart of the liberty protected by the Due Process Clause."). It is simply not true that, once detained, Plaintiff will have access to meaningful "administrative remedies." Defs. Br. 25. He will not be able to seek bail, nor will he be able to seek review of the legality of the Rubio Determination or his constitutional claims before the immigration judge or the BIA. *See supra* at 11. Put another way, Plaintiff will most likely be held in ICE detention for months or years before his case reaches a court of appeals through a PFR.

   ***Balance of the Equities and the Public Interest.*** The "public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Lopez v. Trump*, 2025 WL 3274224, at *9 (S.D.N.Y. July 10, 2025); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[A]ppellants' extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public

---

*X $1.4M for Non-Compliance with Court Orders*, JURIST (Feb. 21, 2025) (reporting that a justice of Brazil's Supreme Federal Court fined X Brazil R$8.1 million for noncompliance with multiple court orders, after the platform failed to provide registration information for an account under investigation for spreading fraudulent news), https://www.jurist.org/news/2025/02/brazil-supreme-federal-court-justice-fines-x-1-4-million-for-non-compliance-with-court-orders/.

23

interest."). While Defendants claim there is a public interest in "the prompt resolution of determining removability," Defs. Br. 26, they have not served Plaintiff with a Notice to Appear, despite having issued the Rubio Declaration more than three months ago. *See Carter v. Sewell*, 2023 WL 7164304, at *1 (S.D.N.Y. Oct. 31, 2023) ("[M]onths-long delays … have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency.") (quoting *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013)). And it is certainly not the case in our judicial system that one side of a dispute can unilaterally proclaim what is in the "public interest," even when that party is the Federal Government. *Contra* Defs. Br. 26.

**Bond Determination.** The Court should reject Defendants' request for a bond. "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm." *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (quotation omitted). Defendants will not suffer monetary damages from an order requiring them to comply with the Constitution—indeed, Defendants consented to the extension of the Court's TRO without a bond and have not identified any "costs and damages" that would somehow be caused now by converting the TRO to a preliminary injunction. Defs. Br. 26; ECF 24 (stipulating to extension of TRO); ECF 35 (same); *see also Widakuswara v. Lake*, 773 F. Supp. 3d 46, 61-62 (S.D.N.Y. 2025); *Alexander v. Sutton*, 747 F. Supp. 3d 520, 556-57 (E.D.N.Y. 2024). Further, as is evident, Plaintiff's single most important reason for filing this case is to be able to remain here with his wife and daughters (who are all U.S. citizens) so he does not present a risk of flight. Judge Broderick recognized as much when he summarily waived the bond requirement for the TRO in the early morning of Christmas Day. ECF 14.

## CONCLUSION

For these reasons, the Court should grant Plaintiff's motion for a preliminary injunction and deny Defendants' motion to dismiss or transfer.

Dated: April 10, 2026
      New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
Avita Anand
Olivia P. Berci
Zahraa N. Jazayeri*
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, N.Y. 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com
aanand@kaplanmartin.com
oberci@kaplanmartin.com
zjazayeri@kaplanmartin.com


*/s/ Christopher J. Clark*
Christopher J. Clark
Andrew J. Rodgers
CLARK SMITH VILLAZOR LLP
666 Third Avenue, 21st Floor
New York, N.Y. 10019
Tel.: (212) 377-0850
clark@csvllp.com
andrew.rodgers@csvllp.com


*/s/ Norman Eisen*
NORMAN EISEN*
STEPHEN JONAS*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003

25

Tel.: (202) 594-9958
norman@democracydefenders.org

*Admitted *pro hac vice*

*Attorneys for Plaintiff Imran Ahmed*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum contains 8,401 words, which exceeds the limit set by the Court's Individual Practices.  On April 10, 2026, Plaintiff requested leave to file an enlarged brief.


Dated: April 10, 2026                         /s/ *Roberta A. Kaplan*
New York, New York                      Roberta A. Kaplan