

1133 Avenue of the Americas
Suite 1500
New York, New York 10036

(212) 316-9500
rkaplan@kaplanmartin.com

May 26, 2026

**BY CM/ECF**

The Honorable Loretta A. Preska
United States District Court
Southern District of New York
500 Pearl St.
New York, N.Y. 10007

> *Re:*   *Imran Ahmed v. Rubio, et al.*, No. 25 Civ. 10705 (LAP)

Dear Judge Preska:

On behalf of Plaintiff Imran Ahmed, we write to inform the Court about another development relevant to Mr. Ahmed's motion for a preliminary injunction. ECF 10; ECF 49; ECF 54.

As we noted in our letter dated May 13, 2026 (ECF 61), certain positions taken by the Government in the separate case of *Coalition for Independent Technology Research v. Rubio, et al.*, No. 26 Civ. 815 (D.D.C.) ("*CITR*"), pending before Chief Judge Boasberg in the D.D.C. are relevant to the issues here. More specifically, the plaintiff in that case, a non-profit that studies the impact of technology on society, seeks to enjoin the Government from using Section 212(a)(3)(C) of the Immigration and Nationality Act (the "Foreign Policy Ground") against individuals who research and report on major internet platforms.

Oral argument on the motion for a preliminary injunction in *CITR* took place on May 13, 2026. During that argument (transcript attached as Exhibit 1), in response to a question from Judge Boasberg, the Government clarified that in order for the Foreign Policy Ground to apply, there "has to be some involvement with a

foreign government censorship regime."  Exhibit 1 at 29.  Later in the transcript, the Government confirms this again as follows:

> The Court: . . . So nobody then—you are saying that nobody who is involved who's not involved with a foreign government could be deported under this policy?
>
> [Government Attorney]: That's right, Your Honor.

*Id.*[1]

While the Government in this case has declined so far to take a position on whether the application of the Foreign Policy Ground is appropriate, those statements are logically inconsistent with the application of the Foreign Policy Ground to Plaintiff in this case.  The Center for Countering Digital Hate ("CCDH"), the non-profit organization that Mr. Ahmed leads, does not receive funding from any government.   While CCDH does advocate that governments (including the government of the United States) implement policies to try to decrease the harmful effects of hate and disinformation online,[2] no governmental entity, including any foreign government, was involved in the preparation of any of CCDH's reports, has any control over what topics CCDH decides to research or what reports CCDH decides to publish.

---

[1] To the extent the Government's position in *CITR* is that only the May 2025 policy is limited to individuals who are involved with foreign governments, the administrative record produced by the Government here, dated February 6, 2026, explicitly states that the decision to target Mr. Ahmed is "[c]onsistent with those foreign policy objectives articulated in the May 2025 [] policy."  ECF 42 at 6.

[2] Examples of recent reports published by CCDH include:  *Grok Floods X with Sexualized Images of Women and Children* (Jan. 22, 2026), https://counterhate.com/research/grok-floods-x-with-sexualized-images/; *Scambook: How Meta Helps Medicare Scammers Target Seniors* (May 12, 2026), https://counterhate.com/research/scambook/; *New CCDH Research Finds X Hosted Flood of Antisemitic Hate, Calls for Further Violence and Conspiracies Following Golders Green Attack* (May 15, 2026), https://counterhate.com/blog/x-hosted-flood-of-antisemitic-hate-calls-for-further-violence-and-conspiracies-following-golders-green-attack/.

Here, the administrative record produced by the Government (ECF 42) does not mention any involvement of Mr. Ahmed or CCDH with any foreign government.[3]  It does refer to CCDH's advocacy efforts, including with respect to the UK Online Safety Act and EU Digital Services Act.  ECF 42 at 7.  Like many U.S.-based civil society organizations and think tanks, CCDH supports the reasonable regulation of social media platforms, including requirements for greater transparency in the United States and overseas.  As an independent not-for-profit organization, CCDH's only role during the passage of the above-referenced UK and EU legislation was to provide evidence based on its own research concerning online safety.

Publishing research used by foreign governments to inform their views of appropriate regulation cannot possibly mean "involvement" under the Foreign Policy Ground either in a manner consistent with how the U.S. government has clarified it in *CITR* or in a way that would not violate the First Amendment.[4]

Respectfully submitted,

Roberta A. Kaplan

cc:    Counsel of Record (via CM/ECF)

---

[3] To the extent the administrative record here references any government at all, it only does so to suggest (falsely) that Mr. Ahmed was a "key collaborator with the Biden Administration"—*i.e.*, with the *United States* government.  ECF 42 at 7.

[4] While use of the word "involvement" here is somewhat vague, the Cambridge Dictionary defines the word "involvement" as: (1) "the act or process of taking part in something," for example "[t]he team's continued involvement in the competition is uncertain;" (2) "a romantic or sexual relationship," for example, "[s]he spoke openly about her involvement with the former prime minister;" or (3) "the state of being included in an activity," for example, "[h]e was accused of involvement in the robbery."  *Involvement*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/involvement#google_vignette (last visited May 26, 2026).  CCDH's conduct clearly does not fit comfortably within any of these definitions of "involvement."